No. 99,813

STATE OF KANSAS, *Appellee*, v. JEREMY JOSEPH WELLS, *Appellant*.

(221 P.3d 561)

Opinion filed December 11, 2009.

Robert V. Eye, of Irigonegaray & Associates, of Topeka, argued the cause, and Elizabeth R. Herbert, of the same firm, was on the brief for appellant.

Bethany C. Fields, deputy county attorney, argued the cause, and Barry Wilkerson, county attorney, and Steve Six, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: Jeremy Joseph Wells was convicted of one count of aggravated criminal sodomy of his fiancée's 5-year-old-daughter,

C.B., in violation of K.S.A. 21-3506. He was sentenced to life in prison without the possibility of parole for 25 years. He now appeals his conviction. Our jurisdiction is pursuant to K.S.A. 22-3601(b)(1) (conviction of an off-grid crime).

The issues on appeal, and our accompanying holdings, are as follows:

1. Did the trial court commit reversible error when it admitted evidence of Wells' prior bad acts under K.S.A. 60-455? Yes.

2. Did the trial court violate Wells' right to a fair trial by limiting the testimony of his expert witness? No.

Because of the erroneous admission of prior bad acts evidence, we reverse Wells' conviction and remand for new trial.

## FACTS

Wells lived with his fiancée, R.B., in Manhattan, Kansas. Also living in the home were R.B.'s three children from previous relationships: 11-year-old B.H., 8-year-old C.H., and 5-year-old C.B. B.H. had her own room. C.H. and C.B. shared a bedroom, with C.H. sleeping in a regular bed and C.B. on a mattress on the floor alongside.

R.B. worked the night shift at a store, usually from 10 p.m. to 7 a.m. Wells worked as a caterer, so he would stay home with the children while R.B. worked. The three children all called Wells "daddy." Prior to the incident alleged in this case, Wells and R.B. had lived together for approximately 5 years, and they intended to get married. However, they recently had been fighting a lot. Wells claimed that about eight times per week R.B. threatened to kick him out of the house. Whenever Wells and R.B. fought, R.B. confided in B.H. and brought her into the problem.

When R.B. returned from work the morning of December 16, 2006, B.H. reported what she had observed in C.B.'s room several hours earlier. Based upon this report and information from C.B., 2 days later Wells was charged with one count of aggravated criminal sodomy.

At the subsequent jury trial, B.H. testified that around 3:30 a.m. she heard C.B. making a groaning noise, so she went to her room to check on her. When she got to C.B.'s room, B.H attempted to

turn on the light, missed and hit the wall, but switched on the light on her second try.

According to B.H., when the light finally came on she saw C.B. lying naked and face down on her bed. Wells was beside her but under the covers. She testified that she "never saw [Wells] without clothes." B.H. knew C.B. was crying because her eyes were wet.

B.H. testified that she asked Wells what he was doing, and he replied "nothing." B.H. said, "I am going to tell mom," and Wells told her he did not care. B.H. then turned off the light and went back to her own room. According to B.H., she then heard C.B. ask if she could put her pants back on, to which Wells said yes. After looking at her statement to police, B.H. recalled that after she confronted Wells in C.B.'s room, he had walked past B.H.'s room and said, " '[Y]ou are pathetic.' "

According to B.H., once Wells left C.B.'s room, B.H. went back into C.B.'s room and either asked her why she had her pants off or why she asked Wells to put her pants back on. C.B. replied, "I don't know." B.H. then went back to her bedroom. Before R.B. came home, B.H. tried to talk to C.B. about the incident. According to B.H., C.B. could not really tell her anything: "She didn't act like anything happened." When R.B. returned home from work, B.H. reported to her mother what she had seen.

B.H. also testified that Wells had a drinking problem. According to B.H., Wells "drank a lot" of beer and tequila. B.H. was "pretty sure" he was drinking the night of the incident because she could hear bottles moving around in the other room and because his eyes were watery.

During her cross-examination, B.H. admitted that she had lied several times in the past. Her mother admitted this problem had surfaced on a number of occasions.

R.B. testified that once she heard B.H.'s information that morning, she took C.B. aside and told her to tell her the truth about what happened the night before. R.B. asked C.B. if Wells had asked her to take off her pants, and C.B. replied, "Yes." R.B. also asked if Wells had asked C.B. to take off her panties, and C.B. replied, "Yes." R.B. then asked, "What did he do?" and C.B. said he "hugged her a lot." After more questioning, C.B. told R.B. that

Wells made her touch his "winky," which R.B. knew was a reference to Wells' penis.

According to R.B., she became extremely upset. When she went into her bedroom to confront Wells, he was passed out on the bed. R.B. shook him, rolled him over, and told him to get out. But Wells just rolled over and went back to sleep.

R.B. again spoke with C.B. and asked her whether Wells had done anything else. C.B. said that she did not want to say it because it was a bad word. After assurances from R.B., C.B. said that Wells had put his thing on her butt (the bad word). R.B. asked whether it was "in" or "on" her butt, and C.B. said that it was "in." R.B. clarified, "Where your poop comes out?" and C.B. said, "Yes." R.B. also asked, "Did it hurt?" and C.B. said, "Yes." C.B. also said that Wells touched her "there," putting her hand on her crotch. When R.B. again told Wells to leave, she received no response because he was passed out on the bed.

R.B. testified that after receiving this information, she called the police, with Officers Les Horn and Danielle Kelley responding. According to Officer Horn's testimony, Wells was snoring in the bedroom when they approached. Horn announced his presence three times before Wells woke up. Wells' eyes were bloodshot and he smelled of intoxicants.

A pretrial ruling had allowed the State to present evidence of Wells' prior bad acts toward C.B. and B.H. Accordingly, Officer Kelley testified that during her interview, B.H. reported that at some previous time Wells "had tried to take her underwear off." According to Kelley, B.H. had told him "no" and he left the room. B.H. also testified about the incident, saying she could not remember when it occurred but that "it was at nighttime and he had tried to get my pants off." B.H. further testified, "He just like tried to pull the side down." She told Wells " 'leave me alone,' " so he left the room.

Similarly, Detective Ryan Runyan testified C.B. told him in her interview that Wells "placed his crotch into her butt crack and it hurt" and that this incident was not the first time it had happened, although she could not give him a number of occurrences. She also told him that the prior episodes had all occurred after their move

into their present house. Runyan gave her an example of "in" versus "out," and C.B. confirmed it was in her butt crack. Runyan's videotaped interview with C.B., which also contained this information, was played for the jury in lieu of her testimony.

Detective Runyan, who also interviewed Wells and R.B., additionally conducted videotaped interviews of C.B.'s siblings: B.H. and C.H. According to Runyan, C.H. had told him that C.H. woke up in the middle of the night and saw B.H. come into the room when she turned on the light. C.H. looked down and saw Wells lying in the bed next to C.B.

Runyan also testified that he had completed a week-long Finding Words interview course to learn the protocol on how to interview children. He testified about what the protocol requires and how he used it. He was cross-examined regarding this training, as well as his knowledge of other protocols and methods of questioning. He was further questioned about the discrepancies in the children's statements.

A physician's assistant trained as a sexual assault examiner testified that after a thorough examination of C.B., there was no obvious trauma to her. Moreover, the results of the DNA test were inconclusive, and no physical evidence connected Wells to the alleged crime. Diana Schunn, Director of the Sexual Assault Nurse Examiner/Sexual Assault Response Team Program in Wichita, testified that the "lack of injury does not confirm or deny that penetration could have occurred."

Wells also testified on his own behalf. According to Wells, he checked on C.B. that night because she often kicks off the covers and he heard a noise. As he was tucking C.B. into bed, B.H. walked into the room, turned on the light, and asked what he was doing. He said, "None of your business. Go back to bed." B.H. told Wells that she was "telling mom," and Wells said, "I don't care. Go back to bed." B.H. went back to bed.

According to Wells, he then went to the room he shared with R.B. and fell asleep. The following morning, R.B. began yelling at him, but he assumed R.B. was upset because he did not pick her up from work, so he fell back asleep. Wells awoke sometime later

when two police officers came into the bedroom. He vehemently denied touching C.B. altogether.

Dr. Kathie Nichols, a Ph.D. psychologist, testified on Wells' behalf as an expert on the subject of interviewing children. She testified about five protocols commonly used for conducting interviews with children who have alleged sexual misconduct. She testified about the use and non-use of their common principles by Detective Runyan in this case. The trial court limited her testimony, however. Among other things, it prohibited her from testifying that the Finding Words protocol as used by Runyan could cause a false accusation of sexual abuse.

The jury convicted Wells of one count of aggravated criminal sodomy in violation of K.S.A. 21-3506. The trial court later sentenced him to life in prison without the possibility of parole for 25 years.

More facts will be provided as necessary to the analysis.

## ANALYSIS

Issue 1: *The trial court erred when it admitted evidence of Wells' prior bad acts under K.S.A. 60-455.*

Wells challenges the trial court's ruling allowing evidence of his prior bad acts pursuant to K.S.A. 60-455. Specifically, the trial court allowed B.H. to testify that one night Wells had tried to remove her pajama pants. It also permitted the jury to hear C.B.'s statements that Wells had previously done the same thing to her as charged in the present case.

The State argues that the trial court was correct in finding that this evidence was relevant to prove Wells' motive and intent. Wells responds that motive and intent were not disputed material facts; that consequently this evidence was inadmissible; that the error was not harmless; and that he is therefore entitled to reversal of his conviction and remand for a new trial.

The version of K.S.A. 60-455 in effect at the time of the alleged crime and during Wells' trial is as follows:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person com-

mitted another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identify or absence of mistake or accident."

We observe that the legislature amended the statute effective April 30, 2009. See L. 2009, ch. 103, secs. 12, 15. Neither party, however, has filed a letter of supplemental authority pursuant to Supreme Court Rule 6.09(b) (2009 Kan. Ct. R. Annot. 47) arguing the amendments' relevance to the issues before us.

*Standard of Review*

As the statute provides, although evidence of prior crimes or civil wrongs cannot be admitted to prove a criminal defendant's propensity to commit the charged crime, it can be " 'admissible when relevant to prove some other material fact.' " *State v. Garcia,* 285 Kan. 1, 12, 169 P.3d 1069 (2007). Several steps are required in determining whether evidence was properly admitted under K.S.A. 60-455. See *State v. Gunby,* 282 Kan. 39, Syl. ¶ 3, 144 P.3d 647 (2006).

The court must determine that the fact to be proven is material, *e.g.,* concerning intent, motive, knowledge, or identity. In other words, the court must determine whether the fact " 'has a legitimate and effective bearing on the decision in the case.' " *Garcia,* 285 Kan. at 14. Our standard of review for materiality is de novo. *State v. Reid,* 286 Kan. 494, 505, 186 P.3d 713 (2008).

The court must also determine that the material fact is disputed. *Reid,* 286 Kan. at 505; *Garcia,* 285 Kan. at 14 (" '[T]he element or elements being considered . . . must be substantially in issue in the case. . . .' ").

The court must also determine whether the evidence presented is relevant to prove the disputed material fact, *i.e.,* whether it has "any tendency in reason to prove" that fact. K.S.A. 60-401(b); *Reid,* 286 Kan. at 505. This court reviews relevance—in particular, the probative element—of K.S.A. 60-455 evidence for abuse of discretion. *Reid,* 286 Kan. at 507. The burden of proof is on the party alleging that the discretion was abused. *Reid,* 286 Kan. at 512 (citing *Garcia,* 285 Kan. at 18-19).

The court must then also determine whether the probative value of the evidence outweighs the potential for producing undue prejudice. *Reid*, 286 Kan. at 503. Our standard for reviewing this determination also is abuse of discretion. *Reid*, 286 Kan. at 512 (citing *Garcia*, 285 Kan. at 18).

Finally, if the presented evidence meets all of these requirements for admission—that the fact is material; that the material fact is disputed; that the evidence is relevant to prove the disputed material fact; and that the evidence's probative value outweighs its potential undue prejudice—then the trial court must give a limiting instruction informing the jury of the specific purpose for the evidence's admission. *Garcia*, 285 Kan. at 12. These safeguards are designed to eliminate the danger that the evidence will be considered to prove the defendant's mere propensity to commit the charged crime. *Gunby*, 282 Kan. at 48.

*Motive*

The trial court determined that motive was a disputed material fact and the prior bad acts evidence was admissible to prove it. According to the trial court, motive was a disputed fact because Wells claimed that his presence in C.B.'s room was for an innocent purpose, *e.g.*, to check on her covers, while the State alleged his motive for being there was to commit sex crimes against her.

"Motive is one of the material facts listed in K.S.A. 60-455 and it is directly disputed. Defendant contends that his presence in C.B.'s room was for the innocent purpose of checking on the child or tucking her in. The evidence proposed by the state bears on its claim that the Defendant had a different, criminal motive in going to C.B.'s room in the middle of the night."

The court determined that the probative value of this evidence outweighed its prejudice and that an appropriate limiting jury instruction would be required.

This court has explained that "motive is the moving power that impels one to action for a definite result." *Reid*, 286 Kan. at 504 (citing *State v. Jordan*, 250 Kan. 180, 190, 825 P.2d 157 [1992]). Evidence of motive is an attempt to explain why a defendant did what he or she did. *Reid*, 286 Kan. at 504 (citing *State v. Engelhardt*, 280 Kan. 113, 128, 119 P.3d 1148 [2005]).

Wells argues that motive evidence only speaks to his impulse or motivation to commit the actual criminal act and that he does not dispute that the motive for an assailant's commission of an aggravated criminal sodomy would be for sexual gratification or the exercise of power. As a result, he argues that motive evidence does not speak to his impulse or motivation to enter C.B.'s room: "Disagreement between the State and Mr. Wells as to his reasons for entering the alleged victim's bedroom is not a valid 'dispute' to satisfy the second requisite of the *Gunby* 60-455 analysis." He claims that the "motive" evidence allowed was instead propensity evidence prohibited under *Gunby*, 282 Kan. at 48-49.

The State essentially responds that the prior acts "showed his motive to commit this current criminal act against CB, as opposed to his innocent explanation that he was just tucking CB in because she had kicked her covers off." It cites *Engelhardt*, 280 Kan. at 128:

"Motive supplies the jury with some degree of explanation, responding to a juror's natural tendency to wonder why a defendant behaved in the manner described by the State. Often it is a prominent feature of the State's theory of its case. Motive makes some sense out of what otherwise appear to be completely senseless crimes."

In our view, the use of the defendant's prior bad acts to ostensibly prove his motive for entering the bedroom here is a dangerously short step away from simply using prior bad acts to prove his motive for committing the current, virtually identical, bad act. A prosecutor might argue: "We know his motive for going to her room that night was to sodomize her—because the evidence shows that he had sodomized her in this same house, perhaps in this same room, on prior occasions." Indeed, the language chosen by the State comes close to making this very argument in the instant case. In its motion to admit into evidence Wells' prior bad acts, it argued: "Motive is defined as the cause or reason which induces action. . . . The prior acts of the defendant towards both C.B. and B.H. show the defendant's motive to commit this current act against C.B." The State essentially repeats this same argument in its brief to this court: "The jury would want to know why the defendant would enter C.B.'s room *and* sodomize her." (Emphasis added.)

Conviction for mere "propensity"—defined by The American Heritage Dictionary of the English Language 1048 (1971), as "an innate inclination, a tendency or bent"—would be the almost certain result of admitting this evidence for motive. If this evidentiary admission practice were approved, prosecutors would understandably begin pressing trial courts for admission of all other past bad acts of a defendant to serve as motive for his or her present charges, especially when any degree of similarity existed.

Our caselaw reveals that typically the prior bad acts used to show motive have not, as in the instant case, been virtually identical to the acts for which the defendant is presently charged. Indeed, few show similarity between the past and present acts. For example, in *State v. Myrick & Nelms*, 228 Kan. 406, 419-20, 616 P.2d 1066 (1980), we held that evidence of an outstanding robbery warrant was admissible as evidence of a defendant's motive for killing a highway patrol trooper who had stopped defendants' car. He simply wanted to avoid arrest on that charge. Similarly, in *State v. Ruebke*, 240 Kan. 493, 503, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987), we held that evidence of defendant's prior theft was admissible to show his motive. The victims had discovered him as he was committing a theft, and he killed them allegedly to prevent his identity from being found and his probation revoked. In the same vein is *Engelhardt*, 280 Kan. at 128-29, where we held that defendant's previous time in prison or his parole status was admissible as motive. The State contended that defendant killed his victim because he was afraid the victim was a snitch who would report him as a parole absconder.

Prior bad acts have also typically been used to explain hostility between the victim and perpetrator as the motive for the crime. See *State v. Tolson*, 274 Kan. 558, 564, 56 P.3d 279 (2002) ("An example of the proper admission of evidence of prior acts to show motive would be a showing of previous conduct that resulted in longstanding bad blood between an assailant and the victim he or she seeks out.") (citing *Jordan*, 250 Kan. at 191).

Our most recent cases follow these models. In *Reid*, 286 Kan. at 509-10, evidence that defendant had been fired from store employment for stealing money from the cash register was admissible

as motive because it tended to explain why he would return to that same store to rob it and kill the clerk. In *State v. Carapezza*, 286 Kan. 992, 999-1000, 191 P.3d 256 (2008), this court approved admission of evidence of defendant's prior drug use and addiction as motive for the robbery, *i.e.*, needing money to buy drugs. Similarly, in *State v. Hughes*, 286 Kan. 1010, 191 P.3d 268 (2008), the defendant was charged with murder, burglary, and robbery. This court approved admission of evidence of defendant's prior drug use and addiction as motive for the robbery, again to obtain money to buy drugs and to "fuel his addiction." 286 Kan. at 1023.

We acknowledge that not all cases show a total lack of similarity between the prior bad acts and the charged ones. In *State v. Vasquez*, 287 Kan. 40, 52-53, 194 P.3d 563 (2008), we allowed evidence of marital discord—an earlier domestic battery by pushing and biting the victim—to show the defendant's motive for killing his wife. In *State v. Brown*, 285 Kan. 261, 300, 173 P.3d 612 (2007), we held that evidence of prior confrontations and altercations was admissible as motive for chasing down the victim and stabbing him to death. However, no appellate decisions approach the *instant* case's degree of similarity between prior and present bad acts.

We conclude that Wells' motive for committing the crime of aggravated criminal sodomy was not a disputed material fact, *i.e.*, it was not substantially in issue in the case. See *Reid*, 286 Kan. at 505. Accordingly, the trial court erred in admitting on this basis the evidence of virtually identical prior bad acts against C.B. It also erred in admitting on this basis the evidence of a similar prior bad acts against B.H.: Wells' attempting to pull down her pajama bottoms one night so he could perhaps sodomize her as he allegedly did C.B.

### Intent

The trial court used the same basic rationale to conclude that intent was a disputed material fact and the prior bad acts evidence was admissible to prove it:

"Intent, like motive, is one of the statutorily designated material facts. As with motive, the intent with which Defendant entered C.B.'s room is both material

and disputed as he claims a proper and innocent intent while the state asserts a criminal purpose."

The trial court determined that the probative value of this evidence outweighed its potential prejudice, provided the jury was properly instructed on the limits for which the evidence could be considered.

In support of the trial court's ruling, the State argues that the reason for Wells' presence in C.B.'s room or on her mattress is subject to two interpretations and therefore in dispute. Wells responds that because he absolutely denies any of the wrongful conduct alleged, intent cannot be a disputed material fact.

This court recently held that " ' "[t]he crucial distinction in admitting other crimes evidence under K.S.A. 60-455 on the issue of intent is not whether the crime is a specific or general intent crime but *whether the defendant has claimed that his or her acts were innocent.*" ' " (Emphasis added.) *State v. Boggs*, 287 Kan. 298, 314, 197 P.3d 441 (2008) (quoting *State v. Dotson*, 256 Kan. 406, 413, 886 P.2d 356 [1994]). If the defendant admits the conduct but offers an "innocent" explanation, the *Dotson* court suggests the evidence of other crimes is admissible on intent. 256 Kan. at 413 (citing *State v. Clements*, 252 Kan. 86, 843 P.2d 679 [1992]).

But if, as in *Dotson*, the defendant admits the conduct and offers no explanation, and no inference can be drawn regarding the innocence of the conduct, the evidence is not admissible on intent:

"[D]efendant admitted to police officers facts sufficient to support his conviction of indecent liberties with [a child] (as acknowledged by his counsel in closing argument). Defendant presented no evidence of 'innocent' acts. The evidence of the circumstances surrounding the indecent liberties acts and the specified acts themselves leave no room for even an inference the acts may have been innocent acts lacking the requisite intent." 256 Kan. at 413.

See also *State v. Nunn*, 244 Kan. 207, 212, 768 P.2d 268 (1989) (defendant admitted during his testimony that he had committed the acts described by the victims; error for court to admit evidence of prior crimes on issue of intent because not in issue).

When a defendant wholly denies committing the alleged acts, admitting evidence of prior bad acts to prove intent is error. See, *e.g., State v. Plaskett*, 271 Kan. 995, 1020, 27 P.3d 890 (2001)

("Intent and related facts are not at issue in that defendant denied all allegations."). In *State v. Davidson*, 31 Kan. App. 2d 372, 65 P.3d 1078, *rev. denied* 276 Kan. 971 (2003), the defendant completely denied the occurrence of the acts underlying the charges of aggravated criminal sodomy and aggravated indecent liberties with a child. After reviewing Kansas case law, which "has not always been consistent," Judge, now Justice, Beier concluded that "[t]he most recent cases from the Supreme Court and our court seem to require the defendant to have asserted an innocent explanation before intent will be considered a disputed material issue. [Citations omitted.]" 31 Kan. App. 2d at 382. The panel held that "[f]ollowing this trend, we hold that the K.S.A. 60-455 evidence questioned here [prior acts of molestation against different victims] was inadmissible to demonstrate intent." 31 Kan. App. 2d at 383.

This court recently affirmed the efficacy of the *Davidson* decision in *Boggs*, 287 Kan. 298, albeit in a drug context. There, defendant's only defense was that he did not ever possess the glass pipe found under the passenger seat in the pickup truck of a friend's father. After citing *Davidson* and other cases, this court held that "[b]ecause Boggs' only defense was that he did not possess the glass pipe, the element of intent . . . [was] not at issue in this case." 287 Kan. at 315. Accordingly, the issue of intent was not material to the resolution of Boggs' case "as the only issue in dispute was whether Boggs ever possessed the pipe and its contents at all." 287 Kan. at 316. As a result, we held that the trial court erred in admitting evidence of Boggs' prior crime of possession of marijuana. 287 Kan. at 317.

Here, the disputed fact is whether Wells touched C.B., not Wells' purpose in entering her bedroom. He completely denies any touching. Therefore, intent was not a disputed material fact in the crime of aggravated criminal sodomy. Accordingly, the trial court erred in admitting the evidence of prior bad acts against B.H. and C.B. on that basis.

*Magnitude of Error*

Now that we have established that the evidence of Wells' prior bad acts was not admissible to show motive or intent under K.S.A.

60-455, we next consider whether the error was harmless or reversible. See *State v. Henderson*, 284 Kan. 267, 294, 160 P.3d 776 (2007)

" '[E]rrors that do not affirmatively cause prejudice to the substantial rights of a complaining party do not require reversal when substantial justice has been done.' [Citation omitted.]" *State v. Voyles*, 284 Kan. 239, 252, 160 P.3d 794 (2007); see K.S.A. 60-261. Among other things, this court specifically considers whether the error is of such a nature as to affect the outcome of the trial. See *Engelhardt*, 280 Kan. at 130 (reversal is required only where erroneous admission of evidence is of such a nature as to affect the outcome of the trial and deny substantial justice).

Similar to our observation in *State v. Jones*, 277 Kan. 413, 423, 85 P.3d 1226 (2004), the absence of physical evidence of sexual abuse transformed this case into a credibility battle. On the one hand, Wells vehemently denied that he ever got into bed with C.B., removed her pants and panties, or inserted his penis into her anus. On the other hand, the conviction was based primarily on the testimony of B.H. and C.B. B.H. did not witness the alleged crime. Her testimony—that she had seen Wells under the bedding with a naked C.B. alongside on top of the covers—only suggested that the crime had occurred. Runyan's videotaped interview with 5-year-old C.B. was played for the jury, and R.B. and Runyan both testified about what C.B. had told them.

In light of all the evidence presented, the jury might well have believed Wells' version were it not for the admission of the prior bad acts evidence. That evidence, since it failed to meet the requirements of K.S.A. 60-455, could have easily created the unfair inference that Wells had a propensity to commit the crime for which he had been charged. This evidence of predisposition is particularly strong concerning C.B., since he allegedly had committed almost identical crimes on prior occasions against her in the same house. The evidence regarding B.H. is admittedly not as strong. However, the testimony that Wells previously had attempted to pull down her pajama bottoms one night until she said no is similar enough to the present allegations against him of pulling down C.B.'s pants early in the morning and sodomizing her so as to also

present prejudicial propensity problems. As we noted in *Jones*, 277 Kan. at 424:

" '[A]dmission of prior wrongful acts simply to show the defendant's bad character, notwithstanding that one possessed of a bad character is more likely to commit a crime than one who is not, is likely to prejudice the jury and blind it to the real issue of whether the defendant is guilty of the crime charged. For example, the jury may feel unsure that the government has proved its case, but decide that the defendant is an evil person who belongs in prison anyway. The jury may wish to punish the defendant for the prior act, even if they are unconvinced that he committed the act charged. Moreover, the jury may be unconvinced that the defendant committed either act, but that he more than likely committed at least one of them and should be punished.' " (Quoting *United States v. Peden*, 961 F.2d 517, 520 [5th Cir. 1992].)

Accordingly, Wells' conviction is reversed and the case is remanded for a new trial.

Wells claims the trial court committed additional error. This claim could now be disregarded because of our reversal and remand. We address it below, however, to supply guidance because it could arise in a retrial. See *State v. Kunellis*, 276 Kan. 461, 476, 78 P.3d 776 (2003).

*Issue 2: The trial court did not violate Wells' right to a fair trial by limiting the testimony of his expert witness.*

Wells claims the trial court erred by limiting the testimony of his expert witness, Dr. Kathie Nichols. Specifically, he argues that she should have been allowed to testify: (1) to present the Sam Stone Research Study concerning the suggestibility of children; (2) to criticize R.B.'s questioning of her daughter, C.B., shortly after the incident; (3) to criticize the Finding Words protocol used by Detective Runyan in his interviews of the children; and (4) to present data on the percentage of false reporting of sexual abuse claims.

Wells argues that these limitations prevented him from presenting evidence in support of his theory of defense and therefore violated his right to a fair trial. See *State v. White*, 279 Kan. 326, 331, 109 P.3d 1199 (2005). The State basically responds that the trial court's limitation was proper and certainly did not stop Wells from presenting substantial evidence supporting his defense theory.

*Standard of review*

We have held that a defendant is entitled to present his or her defense, and a defendant's fundamental right to a fair trial is violated if evidence that is an integral part of that theory is excluded. *State v. Cooperwood*, 282 Kan. 572, Syl. ¶ 1, 147 P.3d 125 (2006). But that right is not unlimited. "[T]he right to present a defense is subject to statutory rules and case law interpretation of the rules of evidence and procedure." *State v. Walters*, 284 Kan. 1, Syl. ¶ 1, 159 P.3d 174 (2007). Furthermore, when a criminal defendant is allowed "to present evidence supporting his or her theory of defense such that the jury could reach a conclusion on its validity, exclusion of other evidence is not necessarily error." *State v. Jones*, 287 Kan. 547, 555, 198 P.3d 756 (2008).

Primary among the rules of evidence to be considered in the instant case is the one absolutely prohibiting a witness from expressing an opinion on the credibility of another witness. *State v. Elnicki*, 279 Kan. 47, 53-54, 105 P.2d 1222 (2005). This is particularly true in the area of child sexual abuse. See *Plaskett*, 271 Kan. at 1009 ("trial court erred in allowing Detective Langer to express his opinion as to whether A.W. was telling the truth" about being the victim of aggravated incest); *State v. Mullins*, 267 Kan. 84, 97, 977 P.2d 931 (1999) (trial court erred in allowing witness to be asked and to provide answer—whether child victim "was coached, which is another way of asking if he was telling the truth"); see also *State v. Lash*, 237 Kan. 384, 385-86, 699 P.2d 49 (1985) (question "clearly was improper" because it called for an expression of expert's opinion about the credibility of minor victim accusing his father of molestation; the determination of the credibility of a witness is for the jury).

The trial judge essentially acknowledged this prohibitory rule of evidence when he addressed the possible limitations on Dr. Nichols' testimony, particularly her criticism of the methodology used in the child witness interviews. He opined that it is "difficult to draw [a] line allowing a criticism of methodology such that it does not become [']therefore this child is not telling the truth.[']" We address how well the judge drew this line and others to provide guidance on retrial.

Equally important to this case as the prohibitory rule articulated in *Elnicki* are the rules concerning the admission of expert testimony. K.S.A. 60-456(b) states:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

This court has provided guidance beyond this statute on the admissibility of expert testimony. "Necessity under the particular circumstances of the case, *e.g.*, helpfulness to the jury, is the basis for the admissibility of expert witness testimony." *Cooperwood*, 282 Kan. 572, Syl. ¶ 5. Consequently, " ' " '[if] the normal experience and qualifications of jurors permit them to draw proper conclusions from [the] given facts and circumstances, expert conclusions or opinions are not necessary.' " ' [Citations omitted.]" *Cooperwood*, 282 Kan. at 578.

Admission of expert testimony usually lies within the discretion of the district court. See *Cooperwood*, 282 Kan. at 578. Sometimes, however, review of this issue is de novo. *White*, 279 Kan. 326, Syl. ¶ 1; see *Kuhn v. Sandoz Pharmaceuticals Corp.*, 270 Kan. 443, 14 P.3d 1170 (2000) (quoting *Koon v. United States*, 518 U.S. 81, 100, 135 L. Ed. 2d 392, 116 S. Ct. 2035 [1996]). Additionally, we have held that when a defendant's claim is that the trial court's ruling interfered with his or her constitutional right to present a defense, review is de novo. *State v. Carter*, 284 Kan. 312, 318-19, 160 P.3d 457 (2007) (citing *State v. Kleypas*, 272 Kan. 894, 921-22, 140 P.3d 139 [2001], *cert. denied* 537 U.S. 834 [2002]). There, this court held that the trial court's ruling was neither an abuse of discretion nor a constitutional violation. *Carter*, 284 Kan. at 320.

*Discussion*

Wells begins by pointing out that this court has not yet addressed the admissibility of expert testimony on the reliability of child witnesses and concerns about the techniques of interviewing them. He points to Court of Appeals opinions addressing the issues and argues they support his contention of trial court reversible error.

Wells first points to *Mullins v. State*, 30 Kan. App. 2d 711, 46 P.3d 1222, *rev. denied* 274 Kan. 1113 (2002). He argues that *Mullins* "strongly implies" that expert testimony on interview techniques can be critical to the defense. Mullins had been convicted of aggravated criminal sodomy and aggravated indecent liberties with a child, primarily based on the testimony of the victim, as there were no visual signs of sexual abuse and no witnesses to the alleged offenses. After Mullins' convictions were affirmed in his 1991 direct appeal to the Supreme Court, he filed a motion under K.S.A. 60-1507 alleging ineffective assistance of counsel, in part because of counsel's failure to consult or procure an expert on the subject of child interviewing techniques.

The *Mullins* Court of Appeals held that defense counsel had been ineffective and reversed and remanded for a new trial. 30 Kan. App. 2d at 716-19. The court observed that if counsel had obtained an expert witness on proper interview techniques, "the jury would have been presented with relatively strong evidence to potentially undermine the allegations of [sexual] abuse." 30 Kan. App. 2d at 717. The court also stated that "because trial counsel failed to present (or even search for) such available expert testimony, the jury heard only the victim's unchallenged allegations of abuse." 30 Kan. App. 2d at 718.

Wells also relies upon *State v. Criqui*, 2003 WL 22119226 (Kan. App. 2003) (unpublished opinion), *rev. denied* 277 Kan. 925 (2003). There, defendant was convicted of multiple counts of sexual abuse of children. A psychologist testified at a suppression hearing and identified the following problems with the interviews of the children:

"[T]he interviewers did not explore alternative hypotheses; the school counselor did not interview the girls separately; several of the interviews were not videotaped or audio recorded; and the use of the 'Snoopy dog' created an atmosphere of 'playfulness, pretend, fantasy.' [The psychologist] opined that although the children's statements were not 'totally unreliable,' the reliability of their statements 'needs to be carefully considered.'" 2003 WL 22119226, at *2.

Defense counsel sought to introduce the psychologist's testimony at trial on how interviewing problems affected the reliability and

accuracy of the children's statements. The trial court excluded the testimony.

Quoting *State v. Sargent*, 144 N.H. 103, 106, 738 A.2d 351 (1999), the *Criqui* court held: " '[W]e agree with those jurisdictions that find that the proper protocols and techniques used to interview child victim witnesses is a matter not within the knowledge and understanding·of the average juror.' " 2003 WL 22119226, at *5. It also quoted with approval *Barlow v. State*, 270 Ga. 54, 507 S.E.2d 416 (1998): " '[T]he defendant in a child molestation case is entitled to introduce expert testimony for the limited purpose of providing the jury with information about proper techniques for interviewing children and whether the interviewing techniques actually utilized were proper.' " *Criqui*, 2003 WL 22119226, at *5.

The *Criqui* court concluded that the trial court erred in excluding that part of the expert testimony regarding proper and improper interviewing procedures and techniques to be used in child sexual abuse cases and the problems perceived by the expert with the interviewing techniques used in that case. While the expert had also been prohibited from testifying about how certain procedures and techniques could adversely affect the reliability and accuracy of the statement of "a given child," the *Criqui* court nevertheless held that the expert should have been allowed to testify how those could adversely affect the statement of "a child," *i.e.*, any child. The *Criqui* court held that the expert could not testify, however, about how those interview problems *actually* affected the reliability and accuracy of the statements of these particular girls or that these girls' statements needed to be viewed with caution. 2003 WL 22119226, at *5.

Nevertheless, the *Criqui* court concluded that the exclusion of the expert testimony was harmless. It noted that there were eyewitnesses and physical evidence and that defense counsel was able, through cross-examination and closing argument, to bring the interviewing errors to the jury's attention. 2003 WL 22119226, at *5. Because the defendant claimed the exclusion resulted in denial of his constitutional right to present a defense, the court applied the federal standard for reviewing error and declared beyond a reasonable doubt that the error had little, if any, likelihood of having

changed the result of the trial. 2003 WL 22119226, at *5; see *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967).

Wells also relies upon *State v. Huntley*, 39 Kan. App. 2d 180, 177 P.3d 1001 (2008), a decision released after his conviction. In *Huntley*, the defendant was convicted of six counts of rape of a child under the age of 14 and seven counts of aggravated criminal sodomy. The defense sought a trial continuance to locate an expert to view the videotaped interviews of the 5-year-old female victim and the 4-year-old male victim and to analyze their testimony. The trial court refused to grant a continuance, finding that the testimony would be inadmissible. The Court of Appeals reversed and remanded the case, concluding that the trial court should not have refused to grant a continuance on the ground that the testimony was likely inadmissible. 39 Kan. App. 2d at 188-89.

The *Huntley* court cited the three erroneous grounds of excluding expert witness testimony in *Criqui*. It also recited *Criqui*'s conclusion that the proper protocols and techniques used to interview child victim witnesses is a matter not within the knowledge and understanding of the average juror. After reciting *Criqui*'s cited caselaw in support of that conclusion, the *Huntley* court observed that "[t]his caselaw seems to be in step with an emerging trend to recognize and permit expert testimony on the impact of suggestive interviewing techniques on child witnesses" in general. 39 Kan. App. 2d at 188.

The *Huntley* court noted that the trial court's determination was premature because the expert had not been "secured, and the scope of his or her testimony could not yet be established." 39 Kan. App. 2d at 188. It held that the exclusion of the testimony was error because "such testimony could be critical to the defense . . . [e]specially where, as here, the defense was heavily dependent on casting doubt on the reliability of child witnesses." 39 Kan. App. 2d at 189. Further, the court concluded that the trial court had been guided by "the erroneous legal conclusion that any such testimony from an expert in these areas would not be admissible." 39 Kan. App. 2d at 189.

The State correctly points out that each of these cases is distinguishable from Wells' case because they contained no expert witness testimony. Here, Nichols *was* allowed to testify but in a limited fashion.

The State also urges us to rely upon caselaw considering the admissibility of expert testimony regarding interrogation techniques employed with adults and regarding eyewitness identifications. In a letter of additional authority filed pursuant to Supreme Court Rule 6.09(b) (2009 Kan. Ct. R. Annot. 47), the State points to *State v. Cobb*, 30 Kan. App. 2d 544, 54 P.3d 855, *rev. denied* 274 Kan. 1115 (2002), and *State v. Oliver*, 280 Kan. 681, 124 P.3d 493 (2005), *cert. denied* 547 U.S. 1183 (2006).

The State cites to *Cobb* for the proposition that an expert's testimony about interrogation techniques and the resultant phenomenon of false confessions "invades the province of the jury and should not be admitted. Cross-examination and argument are sufficient to make the same points and protect the defendant." *Cobb*, 30 Kan. App. 2d at 567. The *Cobb* court held that " 'the jury could decide the issue of the statement's reliability using its common knowledge.' " 30 Kan. App. 2d at 567 (quoting *State v. Davis*, 32 S.W.3d 603, 609 [Mo. App. 2000]). It analogized the situation to the Kansas Supreme Court's prohibition of evidence on the unreliability of eyewitness identification. *Cobb*, 30 Kan. App. 2d at 567; see, *e.g.*, *State v. Warren*, 230 Kan. 385, 395-97, 635 P.2d 1236 (1981).

The State cites to *Oliver* for the proposition that while an expert may testify on the defendant's ability to respond reliably to interrogation, the expert cannot testify as to the reliability of the defendant's answers in the specific confession. In that case where the defendant confessed to his involvement in multiple murders, this court reviewed the trial court's decision to exclude the expert's testimony "regarding Oliver's diagnoses and their potential for affecting his reaction to interrogation." 280 Kan. at 694. We concluded that while an expert may give testimony bearing on a defendant's ability to respond reliably to the police interrogation, such testimony must "remain hypothetical or theoretical. It must stop short of expressing judgment on defendant's reliability in the

specific instance of the confession submitted for the jury's consideration." 280 Kan. at 702. We held that if such expert testimony met these parameters, it was admissible, subject to the trial court's discretion: "We have purposely stated this holding permissively." 280 Kan. at 702.

Before proceeding with our analysis, we observe there does not appear to be a dispute between the parties on several key points. First, a witness cannot testify about another's credibility, particularly in child sexual abuse cases. See, *e.g.*, *State v. Plaskett*, 271 Kan. 995, 1008-09, 27 P.3d 890 (2001). Wells' brief concedes that

"[t]he *Criqui* decision reflects that *Warren*, [230 Kan. 385], and *Mullins*, [30 Kan. App. 2d 711], would support exclusion of the portions of the expert's proposed testimony in which she would have commented on the children's credibility, *i.e.*, her opinions on how the interviewing problems affected the 'reliability and accuracy of the children's statements' and that those statements needed to be 'viewed with caution.' [Citation omitted.] Defendant agrees that those comments, or similar, would have properly been prohibited here."

Second, expert testimony regarding certain child interview techniques in child sexual abuse cases generally can be admissible. Such testimony can take the form of that factor described in *Criqui*: evidence of proper and improper interviewing procedures and techniques to be used. Third, experts may testify about the problems they perceive with the interviewing techniques used in the particular case. See *Criqui*, 2003 WL 22119226 at *4-5.

Wells primarily argues, however, that the trial court's ruling effectively eliminated the third area of expert testimony allowed by the *Criqui* court, *i.e.*, how certain procedures and techniques could adversely affect the reliability and accuracy of a child's statement. He argues that this negative influence, although admittedly implied from the evidence, should be allowed to be made expressly:

"Without the ability to go into those areas [how certain interviewing procedures and techniques could adversely affect the reliability and accuracy of a child's statements], the [1] testimony regarding proper and improper interviewing procedures and techniques, and [2] the problems perceived with the techniques used in this case, *could fail to impress the jury because the consequence, although implied, was not clearly stated or explained.*" (Emphasis added.)

Wells then provides "specific examples" of the trial court's impermissible elimination of this third area of expert testimony in the form of four categories. These concern Dr. Nichols' testimony that was excluded: (1) concerning the Sam Stone Research Study about child suggestibility; (2) criticizing R.B.'s questioning of her daughter, C.B., the morning of the incident; (3) criticizing the Finding Words protocol used by Detective Runyan in his interviews of the children; and (4) regarding data on false reporting. Each will be explored below.

Before analyzing the parties' position on this particular issue, we should make several points. We agree with those courts holding that in child sexual abuse cases (1) identifying proper protocols and techniques for interviewing children and (2) determining whether the techniques actually utilized were proper, *i.e.*, any perceived problems with the techniques used, may be matters not within the knowledge and understanding of the average juror. We recognize, in such cases, that how certain interviewing procedures and techniques could adversely affect the reliability and accuracy of children's statements may similarly be outside the knowledge and understanding of the average juror. However, as more fully explained below, the trial court should be given some latitude in determining what expert testimony will be admitted and is not required to faithfully follow the recipe articulated by the *Criqui* court under its facts. See *Cooperwood*, 282 Kan. at 578 (trial court has considerable discretion in determining whether to permit expert testimony).

### The Sam Stone Research Study and Suggestibility

For Wells' first claim that the trial court erred in disallowing expert testimony on how certain procedures and techniques could adversely affect the reliability and accuracy of a child's statement, he contends Nichols should have been allowed to testify about the Sam Stone Research Study. In this study of preschool-aged children, 72% of the children attributed to an individual, Sam Stone, negative behavior that they had not observed but was based upon information they had been told prior to seeing him. Their mistaken attribution was elicited by leading questions after he left.

Wells argues that most laypersons are not aware that preschool-aged children can and do make totally false reports under suggestive or leading questions. He alleges that "[m]ost lay persons would not recognize that questions that required a yes or no answer are in fact, as applied to young children, considered to be leading or suggestive." He acknowledges that Nichols was allowed to testify that a suggestive question is different from a leading question and that both types of improper questions were present in all three of the videotaped interviews she watched: C.B., C.H., and B.H. However, Wells complains that Nichols "was not allowed to give specific examples or explain how these types of questions can produce inaccurate results."

The State points not only to these Wells acknowledgments but also to the fact that Nichols was allowed to testify about accepted interview protocols from five different professional associations: the National Institute of Child Health and Human Development; the American Academy of Child and Adolescent Psychiatry; the American Medical Association; the American Professional Society on the Abuse of Children; and the American Psychological Association.

The State further emphasizes that Nichols was allowed to testify generally about the problems she perceived with the interviewing techniques used here, e.g., that the professionally accepted protocols from these organizations were not followed. Specifically, she opined that Runyan's interviews were more like interrogations. They were short, and rapport with the children probably was not established; Runyan interrupted the children; the children were not first allowed to tell their story, followed by directed questions by Runyan to "tease out details that weren't given;" and Runyan made no assessment of each child's knowledge of the difference between truth and lying.

In specific response to Wells' argument about the improper limitations on Nichols' testimony regarding suggestibility, the State argues that she was allowed to opine that the suggestibility of children is a concern, without getting into the reasons. It also argues that she was additionally allowed to testify about the effects of coercive or suggestive questioning techniques in general.

Even though Nichols was not allowed to testify about the Sam Stone Research Study on suggestibility, we agree with the State that the jury was allowed to hear Nichols testify about the specific problems with Runyan's interviews in this case. In particular, it heard her opinion of how he inappropriately used suggestive and leading questions in all the interviews. We observe that Nichols was allowed to explain that a suggestive question usually has a yes or no answer because the interviewer is suggesting that the inquiry actually constitutes a statement of fact. She was also allowed to explain that, on the other hand, a leading question leads to a story that may not actually have been told by the child. Most important, she was further allowed to testify that Runyan's leading questions "tend to provide information to the children that they did not know" which "contaminates" the interviews. In short, on these facts there was no abuse of trial court discretion in disallowing evidence about the Sam Stone study.

### Mother's Questioning

For Wells' second claim that the trial court erred in disallowing expert testimony on how certain procedures and techniques could adversely affect the reliability and accuracy of a child's statement, he contends Nichols should have been allowed to criticize the way R.B. questioned her daughter, C.B., the morning of the incident. Wells sought to have Nichols testify that R.B. asked C.B. suggestive and leading questions, apparently as gleaned from R.B.'s written statement memorializing the interview. The trial court ruled that only Detective Runyan's videotaped interviews of the three children could be critiqued by Nichols.

As mentioned, Nichols testified that she criticized Runyan's videotaped interviews because, among other things, they did not simply elicit a story from each of the children and then follow up with directed questions. Wells now argues that it was "important for the jury to know that the questioning of C.B. by the mother was also defective in that way."

We observe Wells candidly admits that Nichols was allowed to testify that one of her criterion for proper questioning was to avoid multiple interviews of the child witnesses, including unsupervised

questioning by family members. She also testified that this practice was not followed because multiple interviews were conducted—which would necessarily include R.B.'s interview of C.B.

Wells' brief also expressly directs us to the trial transcript to show that "the process of mother's questioning of C.B. was testified to extensively by [R.B.]." The transcript also reveals, however, that Wells' counsel was able to cross-examine R.B. at length and to criticize her interview approach. For example, he asked several questions about how R.B. questioned her daughters after she returned home the morning of the incident. The transcript also shows that counsel asked multiple questions about the exact questions she asked and their sequence. He then confirmed that she did ask those "types" of questions.

Counsel also forced R.B. to admit that a word used in her testimony, "winky," was not used in the home by her children, perhaps suggesting she placed that word and others in C.B.'s mouth during her questioning. In short, he had ample opportunity to cross-examine R.B. on her purported use of leading and suggestive questions and other doubtful techniques, e.g., her purported failure to allow her 5-year-old daughter to first simply tell the story and then ask direct questions of C.B.

We conclude that even though Nichols was not allowed to testify critically about R.B.'s interviewing approach with her daughter, her testimony on this subject was not necessary to the jury's decision. The jurors heard Nichols' specific criticisms of the techniques of trained interviewer Detective Runyan. This included her opinion that as a result of leading questions, information could have been provided to C.B. that she did not know which then contaminates the interview. The trial court was within its discretion in determining that the jurors did not need Nichols to repeat many of these same criticisms about similar techniques used by an untrained mother with her daughter, especially when defense counsel addressed them on cross-examination. See *Cooperwood*, 282 Kan. 572, Syl. ¶ 5 (necessity under the particular circumstances of the case is the basis for the admissibility of expert witness testimony). In short, Wells was able to present evidence to the jury of problems existing with the mother's interviewing approach.

*Critique of Finding Words Protocol*

For Wells' third claim of error, he contends Nichols should have been allowed to state her specific criticisms of the Finding Words protocol used by Detective Runyan. Defense counsel indicated that Nichols would have provided general criticisms of the program based on the content of its website and her general knowledge. This criticism would have included, among other things, that the program is for profit; that the website reflects no research or peer-reviewed articles; that the program is sponsored by the Association of Prosecutors Research Institute; that it was established by Cornerhouse; that the protocol does not have the criteria of other protocols; and that the protocol is secret. Consequently, Nichols would have testified that these factors make it difficult for researchers to compare the Finding Words protocol with other protocols.

Although the State does not dispute that Nichols is an expert in clinical/adolescent psychology, it argued that Nichols did not have sufficient knowledge to testify about the Finding Words protocol. She had never been to the training course and had never read its protocol. Her only information came from reading the Finding Words website and from a colleague who had previously used this particular protocol.

The trial court held that Nichols did not have sufficient knowledge of whether the Finding Words Protocol is a valid method because her knowledge was limited to a review of the website and discussions with a colleague. As set forth above, K.S.A. 60-456 limits expert opinion or inference testimony to "such opinions as the judge finds are . . . (2) within the scope of the special knowledge, skill, experience or training possessed by the witness." We agree with the trial court's analysis and holding under 60-456. At the time of trial, Nichols did not have special knowledge about whether the Finding Words protocol is a valid interviewing method. The court properly limited her testimony to a discussion of what is required by other interviewing protocols.

Moreover, even though Nichols was not allowed to testify critically about the Finding Words protocol, we agree with the State that the record reveals Wells was able to present evidence to the

jury indicating that the program was suspect. Most important is Runyan's admission that this protocol is not verified by the scientific community, in apparent contrast to the other five protocols testified to by Nichols, *e.g.*, the American Academy of Child and Adolescent Psychiatry and the American Medical Association. Of additional significance is his admission that the Finding Words protocol does not require him to ascertain whether a child knows the difference between telling the truth and telling a lie. Accordingly, he did not "attempt to assess with [C.B.] if she knew the difference between telling a story and telling truth."

*Data on False Reporting*

For Wells' last claim of error, he contends Nichols should have been allowed to testify that scientific data shows that the " 'incident of false reporting is approximately 68% in cases in which families are being separated.' " He points to evidence in the record and argues that "[i]t is fair to say from that evidence that the family was in turmoil and separation was a definite *possibility.* Consequently, the cited statistical relationship had *potential relevance* to the allegation which arose under such circumstances." (Emphasis added). Wells argues that this data is important because, again, it is "necessary that the expert be able to comment to some extent about what can happen, in general, if improper methods of interviewing are used."

Frankly, the threshold premise for the admission of this particular evidence—the family's separation—is speculative. Wells himself describes the separation, at best, as merely a "definite possibility." Moreover, his characterization of the evidence as having "potential," as opposed to "actual," relevance further dilutes his argument. Finally, relevance is a determination obviously within the trial court's discretion. *State v. Reid,* 286 Kan. 494, 507, 186 P.3d 713 (2008). We cannot hold that the decision to exclude speculative evidence was an abuse of discretion.

In addition to the State's specific responses to Wells' four categories of purported evidentiary error, it also argues that Wells was nevertheless able to present evidence of his defense through other means. Without reviewing its specific examples, we simply note

that Wells essentially admits as much. As mentioned, his brief acknowledges that the adverse effects on the reliability and accuracy of a child's statement of employing improper interviewing procedures and techniques—as used in this case—are implied. He asks merely that the adverse consequences be clearly stated or explained, *i.e.*, as part of Nichols' testimony.

After thoroughly reviewing the record, we conclude that there was neither an abuse of discretion nor a constitutional violation, *i.e.*, a trial court's interference with Wells' constitutional right to present a defense by excluding evidence that was an integral part of it. See *State v. Carter*, 284 Kan. 312, 320, 160 P.3d 457 (2007); *Cooperwood*, 282 Kan. at 578-80. More particularly, the trial court allowed expert testimony on two of the three categories identified in *State v. Criqui*, 2003 WL 22119226, at *4-5 (Kan. App. 2003) (unpublished opinion), *rev. denied* 277 Kan. 925 (2003): (1) proper and improper interviewing procedures and techniques to be used in child sexual abuse cases and (2) the problems perceived by the expert with the interviewing techniques used in this case.

As previously mentioned, the third area addressed in *Criqui*—expert testimony on how certain procedures and techniques could adversely affect the reliability and accuracy of a child's statement—is not a mandatory ingredient in a required recipe. Accordingly, its exclusion from evidence does not necessarily constitute error. Rather, as here, it is subject to the trial court's balancing of the rule prohibiting testimony about a witness's credibility against other evidentiary rules, *e.g.*, the helpfulness of expert testimony to a jury.

In conducting this balancing, the trial court in the instant case did allow some evidence from *Criqui*'s third area. More specifically, Nichols was allowed to testify that the use of leading questions by Runyan—and through implication, by C.B.'s mother—contaminates their interviews of children by providing information that the children did not know. Moreover, after hearing related evidence, the jury was left to determine if other purported improper, or improperly used, procedures and techniques similarly could adversely affect the reliability and accuracy of the witnesses

and their statements. The jury was capable of connecting these particular dots; expert testimony was not required to help them.

Reversed and remanded for a new trial.

MCFARLAND, C.J., not participating.

MARQUARDT, J., assigned.