NOT DESIGNATED FOR PUBLICATION

Nos. 114,713
114,714

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

WILLIE JEROME SMITH-PARKER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Saline District Court; RENE S. YOUNG, judge. Opinion filed November 3, 2017. Affirmed.

*Christina M. Kerls*, of Kansas Appellate Defender Office, for appellant.

*Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., BUSER and LEBEN, JJ.

PER CURIAM: In Saline County criminal case No. 09 CR 1047, the State charged Willie Jerome Smith-Parker with first-degree premeditated murder, theft, and two counts of aggravated burglary. In Saline County criminal case No. 09 CR 633, the State charged Smith-Parker with second-degree intentional murder and aggravated assault. In a consolidated jury trial, Smith-Parker was convicted on all counts but the aggravated burglaries. In *State v. Smith-Parker*, 301 Kan. 132, 340 P.3d 485 (2014) (*Smith-Parker I*), our Supreme Court reversed Smith-Parker's convictions and remanded for a new trial

1

based upon cumulative error. On remand, Smith-Parker's 09 CR 1047 and 09 CR 633 cases remained consolidated despite his objections. Following a second jury trial, Smith-Parker was convicted of the lesser included offense of second-degree intentional murder and theft in 09 CR 1047 and the lesser included offense of second-degree reckless murder and aggravated assault in 09 CR 633. For both cases, the trial court sentenced Smith-Parker to a controlling term of 796 months' imprisonment.

Smith-Parker now appeals his convictions and sentences. He contends that (1) the trial court erred by keeping his cases consolidated for retrial; (2) the trial court erred by allowing nonexpert testimony about cell phone record mapping; (3) the trial court erred when providing the jury with a limiting instruction; (4) the preceding errors when considered together require reversal under the cumulative error doctrine; and (5) the sentences imposed on him violated his Sixth and Fourteenth Amendment rights under the United States Constitution as explained in *Apprendi v. New Jersey*, 530 U.S. 466, 477, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

Nevertheless, for reasons stated below, we reject Smith-Parker's arguments. Accordingly, we affirm his convictions and sentences.

*The Crimes*

On Saturday, June 13, 2009, around 5:20 a.m., police were called to investigate a potential aggravated burglary at the Johnstown apartment complex located in Salina, Kansas. Benjamin Friedman had called police because his and his roommate's 52" flat screen Samsung television set, PlayStation3, videogames, and DVDs were missing from their apartment in building 1012. Friedman had told police that around 4:45 a.m., when his alarm clock went off, he had heard a loud commotion. Friedman said it sounded like "someone rushing down the stairs," then "a car backfiring," and then the "squealing of

2

tires." Friedman explained that when he got out of bed, he noticed that the electronics were missing and the back sliding door of their apartment was open.

Officer Glen Soldan responded to Friedman's 911 call. While investigating, he attempted to contact the other tenants living in building 1012. Yet, when Officer Soldan approached the front door of the downstairs apartment, he immediately noticed that the front door had been damaged. When Officer Soldan knocked on the door, the door opened slightly. Through this slight opening, Officer Soldan could see a man covered in blood lying on the floor. Officer Soldan entered the apartment to help the man, but it was clear that the man was already deceased. The deceased man was eventually identified as Alfred Mack, the tenant of that apartment.

Six days later, on Friday, June 19, 2009, at 6:23 a.m., a nurse at the Salina Regional Health Center (SRHC) called 911 because the man who had just been driven to the emergency room was suffering from a single gunshot wound to the head. Justin Letourneau was the man suffering from the gunshot wound, and Smith-Parker was the man who had driven him to the SRHC. Letourneau was unresponsive and his breathing was irregular.

Officer Crystal Hornseth responded to the 911 call. Upon arrival, Officer Hornseth asked Smith-Parker how Letourneau was injured. Smith-Parker told her that "[he] killed [Letourneau]" while "[o]n the road" because Letourneau was "beating his 'baby's momma'." Smith-Parker immediately clarified this statement, stating: "Well, he didn't even beat her. He told me he was going to kill me." The mother of Letourneau's children and on-again off-again girlfriend was Kendra Yanik-Ducharme. Based upon these statements, Smith-Parker was placed under arrest.

3

Police then immediately started looking for Yanik-Ducharme. Police quickly found Yanik-Ducharme at her Salina apartment and requested that she come down to the station for questioning. Yanik-Ducharme complied.

During that interview, which occurred mid-morning on June 19, 2009, Yanik-Ducharme explained that Smith-Parker and Letourneau had been fighting in front of her apartment around 4 a.m. that morning. Yanik-Ducharme explained that the argument between Smith-Parker and Letourneau eventually moved from her apartment to the house of Smith-Parker's on-again off-again girlfriend, Tiffany Wellman, around 6 a.m. Once at Wellman's house, Smith-Parker and Letourneau got into a car belonging to Wellman, and Smith-Parker drove off with Letourneau in the car. Yanik-Ducharme told police that she did not see either Smith-Parker or Letourneau after this point. Yanik-Ducharme also mentioned to police that Smith-Parker had "killed the guy on Johnstown."

The next day, June 20, 2009, Letourneau died as a result of the gunshot wound to his head.

During the ensuing investigation, the police uncovered additional information tending to incriminate Smith-Parker in the death of Mack. This information included the following: (1) that a cartridge casing found just inside Mack's apartment door and a cartridge casing found inside Wellman's car—the car Letourneau was shot in—were discharged from the same gun; (2) that Travis Graham, Letourneau's stepbrother, confessed that he, Letourneau, Smith-Parker, and a man named Thomas Jenkins had burglarized the "upstairs apartment" before going to "Alfred Mack's [apartment]."

Based on the preceding evidence, the State charged Smith-Parker in two separate criminal cases. In Saline County criminal case No. 09 CR 1047, the State charged Smith-Parker with the following: (1) one count of premeditated first-degree murder of Mack, an off-grid person felony in violation of K.S.A. 21-3401(a) or, in the alternative, one count

4

of first-degree felony murder, an off-grid person felony in violation of 21-3401(b); (2) two counts of aggravated burglary, one stemming from the alleged unauthorized entry of Mack's apartment and the other stemming from the alleged unauthorized entry of Friedman and Johnson's apartment, both severity level 5 person felonies in violation of K.S.A. 21-3716; and (3) one count of theft of the electronics belonging to Friedman and Johnson, a severity level 9 nonperson felony in violation of K.S.A. 21-3701(a)(1). In Saline County criminal case No. 09 CR 633, the State charged Smith-Parker with the following: (1) one count of intentional second-degree murder of Letourneau, a severity level 1 person felony in violation of K.S.A. 21-3402(a); and (2) one count of aggravated assault of Letourneau, a severity level 7 person felony in violation of K.S.A. 21-3410.

*Smith-Parker's First Trial and Appeal*

Before Smith-Parker's jury trial, the State requested that Smith-Parker's 09 CR 1047 and 09 CR 633 cases be consolidated for trial. Over Smith-Parker's objection, the trial court granted the State's request because "each case [was of] the same general character, require[d] the same mode of trial and the same kind of evidence, and occurred in the same jurisdiction within a short period of time."

Smith-Parker's first jury trial was held between October 19, 2010, and October 29, 2010. In the end, the jury found Smith-Parker guilty of the first-degree premeditated murder of Mack, the theft of Friedman and Johnson's electronics, the second-degree intentional murder of Letourneau, and the aggravated assault of Letourneau. The jury acquitted Smith-Parker on the two counts of aggravated burglary.

Smith-Parker appealed his convictions to our Supreme Court in *Smith-Parker I*. In his appeal, Smith-Parker raised numerous errors, including that the trial court erred when it allowed his 09 CR 1047 and 09 CR 633 cases to be consolidated for trial. Our Supreme Court rejected this argument. It held that the ballistics evidence in Smith-Parker's 09 CR

5

1047 case—the Mack murder case—and the 09 CR 633—the Letourneau murder case—were strong enough to make the cases "connected together" as meant under K.S.A. 22-3202(1) for consolidation. *Smith-Parker I*, 301 Kan. at 159-60.

Nevertheless, our Supreme Court ultimately reversed Smith-Parker's convictions and remanded for a new trial under the doctrine of cumulative error. Highly summarized, our Supreme Court held that the trial court's exclusion of certain testimony from Yanik-Ducharme, failure to tell the jury to restart deliberations upon replacing a juror with an alternate, and failure to investigate the replaced juror's allegations of jury misconduct were all errors that denied Smith-Parker his right to a fair trial when considered cumulatively. 301 Kan. at 168.

*Pretrial Motions Upon Remand*

Because of the first jury's aggravated burglary acquittals, Smith-Parker's 09 CR 1047 case upon remand included just the charges for first-degree murder of Mack and the theft of Friedman and Johnson's electronics. The charges in Smith-Parker's 09 CR 633 case remained the same. Further, the 09 CR 1047 and 09 CR 633 cases remained consolidated for trial. Even though he recognized the *Smith-Parker I* court's consolidation ruling, Smith-Parker requested that the trial court sever his 09 CR 1047 and 09 CR 633 cases for trial. Smith-Parker argued that his aggravated burglary acquittals made any connection between the ballistics evidence weaker. At the hearing on this motion, the State cited to *Smith-Parker I*, arguing that the ballistics evidence created a strong enough connection between Smith-Parker's cases under K.S.A. 22-3202(1) for consolidation purposes.

The trial court, which was now presided over by a different judge, agreed with the State. It denied Smith-Parker's motion to sever his cases for trial for the following reasons:

6

"The Court denies the Defendant's Motion to Sever the Consolidation for Trial. The Court finds and concludes that the ballistics evidence that the same firearm killed both Mack and Letourneau; that defendant admitted he shot Letourneau; that defendant disposed of the firearm en route to the hospital after Letourneau was shot; that defendant and Letourneau were known to share a gun, and both were in possession of a .22 caliber gun during the period of the two shootings all sufficiently connect the two crimes together to allow them to be consolidated for trial, under K.S.A. 22-3202 subsection (1)."

In addition to the preceding motion, Smith-Parker filed a motion in limine in which he argued that the State should be prohibited from making any statement in reference to the aggravated burglaries based on his acquittals. According to Smith-Parker, this meant that the State was prohibited from presenting any evidence tending to establish that he entered either Mack's or Friedman and Johnson's apartment without authority or with the intent to commit a felony therein.

The State responded that although it would not use the words "burglary" or "burglarize" at Smith-Parker's second trial, it intended to present evidence that tended to prove he committed burglaries because that same evidence also tended to prove that he murdered Mack and stole Friedman and Johnson's electronics. The State then argued that the trial court should consider any evidence that tended to prove that Smith-Parker committed burglaries but also tended to prove that Smith-Parker committed either the murder of Mack or the theft of Friedman and Johnson's electronics properly admissible K.S.A. 60-455 evidence.

In the end, the trial court accepted the State's argument. First, the trial court ruled that "as long as the evidence the State [sought] to admit [was] relevant and material to prove the elements of theft or murder, it would be admissible . . . ." Then, the trial court found that any evidence tending to prove that Smith-Parker committed the burglaries was properly admissible K.S.A. 60-455 evidence because such evidence was relevant to

7

proving the identity, opportunity, and plan, which were material facts in dispute, and that this evidence was so probative that it outweighed any prejudicial effect. Lastly, the trial court ensured Smith-Parker that it would give a limiting instruction based on the admission of K.S.A. 60-455 evidence. As ensured, the trial court gave a limiting instruction to the jury.

*Smith-Parker's Second Jury Trial*

Smith-Parker's second jury trial was held between April 27, 2015, and May 12, 2015. Over the course of the trial, the State had over 75 people testify on its behalf. The State's theory against Smith-Parker in the 09 CR 1047 case was that Smith-Parker aided and abetted in the murder of Mack and theft of Friedman and Johnson's electronics. Although the State argued that Smith-Parker could very well have been the person who had shot Mack, the State emphasized that the jury could find Smith-Parker guilty as long as it believed he aided and abetted his accomplices—Jenkins, Letourneau, and Graham—in the completion of the murder. The State's theory against Smith-Parker in 09 CR 633 was that Smith-Parker became angry with Letourneau, intentionally killing him during their argument. The State alleged that Smith-Parker shot Letourneau while Letourneau sat in the front passenger seat of Wellman's car, when the car was still parked in front of Wellman's house.

Concerning Mack's death and the theft, Donyell Smith and Nathan Johnson (Nathan) placed Jenkins at the Johnstown apartment complex in the early morning hours of June 13, 2009. Smith and Nathan lived in another apartment of building 1012; their apartment was directly across from Mack's apartment and directly below Friedman and Johnson's apartment. Both Smith and Nathan were friends with Jenkins. Smith testified that she was drinking on their porch sometime after midnight in the very early hours of June 13, 2009, when she saw Jenkins across the way with a black man and a white man. Of significance, although Smith could not provide any additional description regarding

8

the men accompanying Jenkins, Smith-Parker is black, Letourneau was white, and Letourneau's stepbrother Graham is white. Smith testified that she spoke to Jenkins for some time before Jenkins walked away. Nathan testified that he saw Jenkins later that morning around 2 or 3 a.m., at which point they discussed the fact that Friedman and Johnson had left their sliding glass door partly open.

Yanik-Ducharme testified that she remembered Smith-Parker and Letourneau waking her up very early in the morning on June 13, 2009; she testified that it was early enough that it was still dark out. She testified that they had brought in a large flat screen television into her apartment. She testified that the television's brand started with an "S," possibly a Samsung or Sony television. She stated that the television disappeared from her apartment a few days later; she was under the impression that Smith-Parker and Letourneau were taking it to Wichita.

Wellman testified that early one Saturday morning in June 2009 she was awakened by people talking in her living room. At trial, she testified that she could not recall specific details about who these people were. Yet, the State admitted into evidence Wellman's June 20, 2009, police interview where Wellman told police that it was Smith-Parker, Letourneau, and "a white guy" she did not know who had awakened her. Wellman also told police that shortly after that morning either Smith-Parker or Letourneau gave her and Smith-Parker's 7-year-old son a PlayStation3 as a gift. The PlayStation3 was wrapped up in a blanket and had cords sticking out of it. In her police interview, Wellman explained that many videogames and DVDs had also started showing up in her house between June 13, 2009, and June 19, 2009.

Kendra Jenkins (Kendra), Thomas Jenkins' wife, testified that sometime around 2 a.m. on June 13, 2009, she came home to find her husband, Smith-Parker, Letourneau, and a white man she only knew as Letourneau's brother at her house. Kendra testified that she decided to leave with a friend, but when she returned home at 7 a.m., all four men

9

were still at her house. She testified that she overheard a conversation about a large flat screen television before she went to bed. Kendra further testified that a few days after this incident, Jenkins made her drive him to the country to burn a pair of "Servus" brand rubber boots. With Kendra's cooperation, police were able to recover the burned remnants of a Servus brand boot sole; this boot was admitted into evidence.

Various law enforcement officers testified about the physical evidence recovered in connection to Mack's death as well as the circumstances surrounding Mack's death. Investigator Ron Styles testified that it appeared that Mack's door had been kicked in. Investigator Styles explained how there was a footprint on the center-exterior portion of Mack's door, which he was able to use technology to "lift." The footprint was left by a Servus brand boot. Investigator Styles also testified about finding a Winchester Super X .22 cartridge casing just inside Mack's apartment door. Another police officer testified about finding an empty gun case, nine Winchester Super X .22 bullets, a box of .38 special ammunition, a PlayStation3, and numerous videogames and DVDs at Wellman's house. This officer also testified that the serial number on the PlayStation3 and the titles of the videogames and DVDs recovered from Wellman's house matched those stolen from Friedman and Johnson's apartment.

To get the phone records of Smith-Parker, Letourneau, Jenkins, Graham, and Wellman admitted into evidence, the records custodians of their respective cell phone providers were called as expert witnesses by the State. The phone records established that Smith-Parker, Letourneau, Jenkins, and Graham had been calling each other on their respective cell phones in the early morning hours of June 13, 2009, before the crimes occurred at the Johnstown apartment complex. Smith-Parker also placed 11 phone calls to Jenkins between 10:18 p.m., June 18, 2009, and 5:42 a.m., June 19, 2009. Michael Rogers, an investigator with the Saline County Attorney's Office, testified about cell phone records mapping. This is when a cell phone user's general geographical location can be determined by the user's cell phone records and the cell towers that the user's calls

10

connected with. Over Smith-Parker's objection, maps Rogers created based on calls Smith-Parker placed on June 13, 2009, and June 19, 2009, were admitted into evidence.

Holly Latham, a KBI blood splatter expert, testified that there was blood all over Mack's apartment, indicating that Mack moved around before finally collapsing and dying on his kitchen floor. Dr. Altaf Hossain, the coroner who performed Mack's autopsy, testified that Mack was shot in the chest, with the bullet piercing his left lung and pericardial sac at a range of 2 to 3 feet. He testified that Mack's death resulted from this injury and was a homicide. Dr. Hossain testified that it could have taken anywhere from one to five minutes for Mack to die from this gunshot wound.

In addition to the preceding evidence, the State admitted letters Smith-Parker had written while in jail. The first letter was from Smith-Parker to Wellman, and he asked Wellman to check her work schedule because he was confident that he had spent the morning of June 13, 2009, with her at her home. His second letter was to his and Wellman's 7-year-old son. In this letter, he placed blame on Wellman: "Your mom don't remember me being at the house, but I had you with me from the time we woke up, went over to Justin's, and brought everybody back to the park by the house." His third letter was to a person named "TJ." In this letter, Smith-Parker wrote: "[Wellman] could of ended one of these cases, but all of a sudden she had a memory lapse. Man that bitch ain't shit."

Concerning Letourneau's death, Yanik-Ducharme testified about the argument that occurred between Smith-Parker and Letourneau in the early morning hours of June 19, 2009. Evidently, Yanik-Ducharme and Letourneau had been fighting for some time. They had both gone to an event at a local bar on June 18, 2009, but had gone with different groups of friends. When Yanik-Ducharme arrived home around 4 a.m., Smith-Parker and Letourneau were sitting in Wellman's car waiting for her. Letourneau, who did not have keys to Yanik-Ducharme's apartment, confronted Yanik-Ducharme when she returned on

11

her front porch of her apartment. He eventually hit her across the face. Yanik-Ducharme testified that she then went to Smith-Parker for help. She stated that after Smith-Parker and Letourneau yelled at one another for a while, Smith-Parker got into Wellman's car and then sped off.

Yanik-Ducharme testified that when Smith-Parker returned several minutes later, he had a large silver semi-automatic gun in his hand. Two neighbors of Yanik-Ducharme also testified that Smith-Parker was holding a gun while arguing with Letourneau. One of those neighbors testified that Smith-Parker was yelling that he was going to kill Letourneau. Yanik-Ducharme explained that Smith-Parker eventually left her apartment, but Letourneau told her to drive him over to Wellman's house, where they presumed Smith-Parker would be.

Yanik-Ducharme drove to Wellman's house, arriving there around 6 a.m. Yanik-Ducharme testified that once at Wellman's house, Letourneau got out of her car and knocked on Wellman's door. Although Yanik-Ducharme remained in her car, Yanik-Ducharme testified that she could see Smith-Parker open the door, walk outside, and continue the argument with Letourneau. She explained that during the argument, Smith-Parker threw his gun, which was the same gun he had at her apartment, down on the ground. She testified that shortly thereafter, Smith-Parker got into the driver's side seat of Wellman's car and Letourneau got into the passenger seat of Wellman's car, and they drove off together.

Sheree Osland, a nurse at SRHC, testified that as soon as Smith-Parker arrived with Letourneau, she called 911; her emergency call was placed at 6:23 a.m. Osland testified that Smith-Parker had told her that Letourneau had attempted to commit suicide. Officer Hornseth, who was the first police officer to respond to Osland's call, testified that she turned on her pocket recorder before speaking to Smith-Parker. Her pocket recorder captured Smith-Parker's comment that he had "killed [Letourneau]" while "[o]n

12

the road" because Letourneau was "beating his 'baby's momma,'" which was immediately followed by the statement: "Well, he didn't even beat her. He told me he was going to kill me."

Besides this recorded statement, a telephone conversation Smith-Parker had with Kathy Trato, Letourneau's mother, was admitted into evidence. In this telephone conversation, Smith-Parker told Trato that Letourneau was not suicidal but accidently shot himself while messing around with the gun. When Trato asked Smith-Parker where the gun was, he told her he had thrown it in the river while driving Letourneau to the hospital because it was "involved" in "something else."

Dr. Ronald Distefano, the coroner who performed Letourneau's autopsy, explained that based upon the stippling on Letourneau's forehead, he was certain that the gun was not touching Letourneau's skin when he was shot. Instead, he estimated that the gun was about a few inches away from Letourneau's forehead. Dr. Distefano explained that the bullet entered near Letourneau's right temple, moving left to right and at a slightly downward and front to back angle. Dr. Distefano testified that he believed that Letourneau's death was not an accident or a suicide, but a homicide.

A significant part of both the State's cases against Smith-Parker was the ballistics evidence. In addition to the .22 millimeter cartridge casing found just inside Mack's apartment door, the police found a .22 millimeter cartridge casing under the driver's seat of Wellman's car. The cartridge casings, as well as the bullets removed from Mack's and Letourneau's bodies, were sent to Zachary Carr, a KBI gun specialist. Carr testified that despite being heavily damaged, he could tell that the bullets retrieved from Mack's and Letourneau's bodies were both .22 millimeter bullets. Carr testified that the cartridge casings belonged to Winchester Super X .22 millimeter bullets. He then concluded that the cartridge casing found just inside Mack's apartment door was discharged by the same gun as well as the cartridge casing found under the driver's seat of Wellman's car. He

13

testified he reached this conclusion because the cartridge casings had identical linear markings, firing pin impressions, and extractor mark impressions under 30x and 60x magnification.

For his 09 CR 1047 case, Smith-Parker's defense was that he did not murder Mack and he did not steal Friedman and Johnson's electronics. Smith-Parker's arguments emphasized that there was no direct evidence tying him to these crimes. He stressed that although Jenkins and Letourneau may have been guilty of committing the murder and theft, he was not. He also insinuated that he was at Wellman's house when Mack was murdered and Friedman and Johnson's electronics were stolen.

For his 09 CR 633 case, Smith-Parker argued that he never threatened Letourneau and he never meant to hurt Letourneau. The only evidence Smith-Parker presented in his own behalf came in the form of his own testimony. But Smith-Parker's testimony was of a limited nature.

Smith-Parker's description of how the argument between him and Letourneau started and ultimately reached Wellman's house differed little from Yanik-Ducharme's testimony. He did assert, however, that he never brandished the gun or in any way threatened Letourneau during their argument.

Regarding what happened once at Wellman's house, Smith-Parker testified that when Letourneau knocked on Wellman's front door, Smith-Parker walked out to the front lawn where he threw his gun on the ground. Smith-Parker then explained what happened next: "Yeah. I'm talking to him out there. I'm talking to him. We at the grass, we talking. And so I can't say what he said, but I was, like, I don't need a gun, you know. So then I told him to take his gun." Although unclear, somewhere in this exchange Smith-Parker and Letourneau must have decided to take a drive in Wellman's car because Smith-Parker testified that he then went inside to get Wellman's car keys. He explained that after

14

getting the car keys, he decided to retrieve the gun he had thrown on the ground because he did not want his son to pick it up.

Smith-Parker testified that once in Wellman's car, he placed the gun near the car's gear shift and Letourneau began giving him driving directions. He testified that Letourneau had him drive to a place out in the country where they used to practice shooting. He testified that he decided to sit on the hood of the car while Letourneau remained in the passenger seat of the car. Smith-Parker testified that it was at this point that Letourneau picked up the gun and started playing with it by pointing it at his head and "talking stupid." He testified that he told Letourneau to stop while attempting to yank the gun out of Letourneau's hand. Smith-Parker asserted that this is when the gun accidently went off, resulting in a gunshot wound to Letourneau's head. Smith-Parker testified that he then got into the car and started driving to the hospital. He asserted that he was able to toss the gun into a river while crossing a bridge on the way to the hospital without ever stopping.

During cross-examination, Smith-Parker testified that at one point during his argument with Letourneau, Yanik-Ducharme grabbed at him even though he was holding the gun. He testified that he responded by pushing Yanik-Ducharme out of the way because he knew the gun had a "hair trigger." When confronted by the prosecutor why he would try to yank the gun away from Letourneau's hand if he knew the gun had a "hair trigger," Smith-Parker said:  "Dude, it was stupid. I admit that. But it—but I just did it, man, just trying to take that gun away from his head, man. I told him to quit playing with it."

At the close of the case, the jury was instructed that it could find Smith-Parker guilty of the murder of Mack if it believed he aided or abetted in the commission of the offense. In addition to the first-degree murder instruction involving Mack's homicide, the jury was also instructed on the possibility of convicting Smith-Parker of second-degree

15

intentional murder as a lesser included offense. Moreover, in addition to the second-degree intentional murder instruction concerning Letourneau's homicide, the jury was also instructed on second-degree reckless murder and involuntary manslaughter as lesser included offenses. In the end, the jury found Smith-Parker guilty of the second-degree intentional murder of Mack, the theft of Friedman and Johnson's electronics, the second-degree reckless murder of Letourneau, and the aggravated assault of Letourneau.

*Sentencing*

For his 09 CR 1047 case, the trial court sentenced Smith-Parker to 653 months' imprisonment for the second-degree intentional murder of Mack and 7 months' imprisonment for the theft of Friedman and Johnson's electronics. For his 09 CR 633 case, the trial court sentenced Smith-Parker to 123 months' imprisonment for the reckless second-degree murder of Letourneau and 13 months' imprisonment for the aggravated assault of Letourneau. Each of the sentences the trial court imposed were the aggravated presumptive sentences under the Kansas Sentencing Guidelines Act (KSGA). Moreover, the trial court ran each of Smith-Parker's sentences consecutively, which resulted in Smith-Parker receiving a combined total sentence of 796 months' imprisonment.

Smith-Parker timely appealed his convictions and sentences from both his 09 CR 1047 and 09 CR 633 cases.

*Did the Trial Court Err by Consolidating Smith-Parker's Cases for Trial?*

Smith-Parker's first argument concerns the trial court's denial of his motion to sever his 09 CR 1047 and 09 CR 633 cases upon remand. Although he recognizes our Supreme Court's holding in *Smith-Parker I*, Smith-Parker argues that our Supreme Court's holding in *Smith-Parker I* was not binding under the law of the case doctrine because of differences between his first and second trial. Then, Smith-Parker argues that

consolidation of his cases was improper because "the mere fact that the crimes involved the same gun was not sufficient to consolidate the cases." Finally, Smith-Parker argues that even if consolidation of his cases was technically proper under K.S.A. 22-3202(1), the trial court's decision was still an abuse of discretion because it bolstered the State's otherwise weak cases against him.

The State simply responds that the law of the case doctrine precludes this court from relitigating Smith-Parker's argument.

*Applicable Law*

K.S.A. 22-3203 states: "The court may order two or more complaints, informations or indictments against a single defendant to be tried together if the crimes could have been joined in a single complaint, information or indictment." K.S.A. 22-3202(1) states:

> "Two or more crimes may be charged against a defendant in the same complaint, information or indictment in a separate count for each crime if the crimes charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

Appellate courts review a trial court's decision to consolidate a defendant's criminal cases for trial in three steps, with each step having its own standard of review:

> "First, the court considers whether K.S.A. 22-3203 permitted consolidation. Under that statute, multiple complaints against a defendant can be tried together if the State could have brought the charges in a single complaint. K.S.A. 22-3202(1) spells out the three conditions permitting the joining of multiple crimes in a single complaint. Whether one of the conditions is satisfied is a fact-specific inquiry, and the appellate court reviews the

17

district court's factual findings for substantial competent evidence and the legal conclusion that one of the conditions is met de novo. Second, because K.S.A. 22-3202 provides that charges 'may' be joined, a district court retains discretion to deny a request to consolidate even if a statutory condition is met. This decision is reviewed for an abuse of discretion. Finally, if an error occurred in the preceding steps, the appellate court considers whether the error resulted in prejudice, *i.e.*, whether it affected a party's substantial rights." *State v. Hurd*, 298 Kan. 555, Syl. ¶ 1, 316 P.3d 696 (2013).

Smith-Parker I

When Smith-Parker appealed the trial court's decision to grant the State's motion for consolidation in *Smith-Parker I*, his challenge focused on whether the trial court's "findings satisfied one of the conditions precedent in K.S.A. 22-3202(1) as a matter of law." 301 Kan. at 157. Our Supreme Court declared that there are three statutory conditions under K.S.A. 22-3202(1) that, if met, allow for consolidation: (1) if the crimes are of the same or similar character; (2) if the crimes were based on the same act or transaction; or (3) if the crimes were based on two or more acts or transactions connected together or constituting parts of a common scheme or plan. 301 Kan. at 158-59. Our Supreme Court quickly determined that Smith-Parker's 09 CR 1047 and 09 CR 633 cases were not of the same or similar character or based on the same act or transaction under the first and second statutory conditions. 301 Kan. at 158-59. Moreover, our Supreme Court determined that some of the trial court's findings under the third statutory condition were off the mark. 301 Kan. at 159. Nevertheless, our Supreme Court ultimately held that Smith-Parker's 09 CR 1047 and 09 CR 633 cases were "connected together" as meant under the third statutory condition of K.S.A. 22-3202(1). 301 Kan. at 160.

First, our Supreme Court explained that "the 'connected together' phrase from the third statutory condition precedent would be applicable in three situations: (1) when the defendant provided evidence of one crime while committing another; (2) when some of

18

the charges were precipitated by other charges; or (3) when all of the charges stemmed from a common event or goal." *Smith-Parker I*, 301 Kan. at 159 (citing *Hurd*, 298 Kan. at 562). Then, our Supreme Court explained why the ballistics evidence created a sufficient connection under this third statutory condition precedent to allow consolidation:

> "[The ballistics evidence] demonstrated that the gun used to shoot Mack was the same gun used to shoot Letourneau. Shell casings at both crime scenes matched. The district judge specifically made a factual finding that the ballistics evidence tied the two crimes together. *That finding alone is sufficient to satisfy the third statutory condition.*
>
> "Our conclusion is further bolstered by the evidence that ultimately came out at trial. Smith-Parker admitted he had been in possession of the gun after Letourneau was shot and had disposed of it during his race to the hospital. His choice to dispose of the gun when his friend was bleeding from a head wound was particularly damaging evidence for the defense. And other evidence reinforced that a .22 had been seen in the possession of Smith-Parker and Letourneau in the period of time covering both crimes.
>
> "In short, the evidence supporting Smith-Parker's conviction of the second crime also tended to support his conviction of the first crime. The ballistics evidence from the scenes and Smith-Parker's admission of possession and disposal of the gun used in the second crime, along with witnesses' observations of such a gun being traded contemporaneously between him and Letourneau, helped to place Smith-Parker at the scene of and participating in Mack's murder. The two crimes—and the two cases that arose out of them—were sufficiently 'connected together' to satisfy K.S.A. 22-3202(1)." (Emphasis added.) *Smith-Parker I*, 301 Kan. at 160.

Last, our Supreme Court turned to Smith-Parker's arguments that the trial court abused its discretion by consolidating his cases for trial. In rejecting this argument, our Supreme Court explained:

> "Smith-Parker's arguments do not focus clearly on this step; the only portion that could be construed as addressing it is his argument that consolidation led to prejudicial admission of other-crimes evidence under K.S.A. 60-455. But '"Kansas case law and the provisions of K.S.A. 22-3202(1) make it clear that joinder is not dependent upon the

19

other crimes being joined meeting the admissibility test set forth in K.S.A. 60-455."'
[Citations omitted.]

"We hold that the district judge's consolidation of the two cases against Smith-Parker was not error. We need not reach the third step under *Hurd*, *i.e.*, whether any error in consolidation demands reversal." *Smith-Parker I*, 301 Kan. at 161.

*Law of the Case Doctrine is Determinative*

With the *Smith-Parker I* court's ruling approving of the consolidation of Smith-Parker's cases in mind, we now turn our focus to the law of the case doctrine.

"Under the law of the case doctrine, when a second appeal is brought in the same case, the first decision is the settled law of the case on all questions involved in the first appeal, and reconsideration will not normally be given to such questions." *State v. Kleypas*, 305 Kan. 224, Syl. ¶ 2, 382 P.3d 373 (2016), *cert. denied* 137 S. Ct. 1381 (2017). This doctrine is not "'an inexorable command'" but "'a discretionary policy which expresses the practice of the courts generally to refuse to reopen a matter already decided, without limiting their power to do so.'" 305 Kan. at 245 (quoting *State v. Collier*, 263 Kan. 629, 631, 952 P.2d 1326 [1998]). As of yet, courts have recognized only three limited exceptions where the law of the case can be changed. "These exceptions apply when (1) a subsequent trial produces substantially different evidence, (2) a controlling authority has made a contrary decision regarding the law applicable to the issues, or (3) the prior decision was clearly erroneous and would work a manifest injustice." 305 Kan. at 245.

When Smith-Parker argued that the trial court should sever his cases before his second trial, neither of the parties nor the trial court addressed the law of the case doctrine. Even so, Smith-Parker implicitly concedes that the law of the case doctrine precludes our review unless he can show that one of its exceptions applies. Smith-Parker asserts that this court should use our limited discretion to reconsider whether his cases

can be properly consolidated for trial because he believes there were "differences between [his] first and [his] second trial." Thus, it seems he asks this court to invoke the first law of the case doctrine exception, where a subsequent trial produces substantially different evidence.

The substantially different evidence Smith-Parker emphasizes is the omission of Xavier Matthews' testimony at his second trial. At his first trial, Matthews testified that Letourneau had been talking about committing the crimes at the Johnstown apartment complex. Matthews further testified that he was aware that Letourneau and Smith-Parker had traded a .22 caliber gun and a .357 caliber gun with one another. See *Smith-Parker I*, 301 Kan. at 143. But Matthews did not testify at Smith-Parker's second trial. Smith-Parker also asserts that his second trial was different because the State did not pursue its cases against him under a theory that he killed Letourneau because he had been talking about the crimes. In short, it seems Smith-Parker argues that the gun-related evidence in his second trial was different enough from the gun evidence in his first trial that the law of the case doctrine does not preclude review.

The State admits that its evidence against Smith-Parker at his second trial was not exactly the same as the evidence against Smith-Parker at his first trial. Still, the State argues that Smith-Parker's argument ignores that the ballistics evidence that the *Smith-Parker I* court found relevant remained unchanged. Indeed, a quick review of the ballistics evidence presented against Smith-Parker in his second trial and the *Smith-Parker I* court's rulings clearly establishes that the ballistics evidence the *Smith-Parker I* court deemed important remained unchanged.

Once again, at Smith-Parker's second trial, KBI gun specialist Carr testified that the cartridge casing found just inside Mack's apartment door was discharged by the same gun as the gun that discharged the cartridge casing found under the driver's seat of Wellman's car. Moreover, the bullets removed from Mack's and Letourneau's bodies were

21

both .22 millimeter bullets. The *Smith-Parker I* court found that based on the preceding ballistics evidence, it was clear that "the gun used to shoot Mack was the same gun used to shoot Letourneau." 301 Kan. at 160. It then held this "*finding alone [was] sufficient to satisfy the third statutory condition.*" (Emphasis added.) 301 Kan. at 160. In other words, the ballistics evidence was of such a compelling nature that it, in and of itself, was sufficient to meet the "connected together" statutory condition under K.S.A. 22-3202(1).

Very clearly, based (1) the *Smith-Parker I* holding and (2) the unchanged ballistics evidence, Smith-Parker's arguments why this court should use its limited discretion to apply the first law of the case doctrine exception is wholly unpersuasive. In short, even though some of the evidence against him may have changed in his second trial, none of the ballistics related evidence—that our Supreme Court had found so compelling that it "connected together" his cases under K.S.A. 22-3202(1)—changed. For this reason, we reject Smith-Parker's argument and hold that the law of the case doctrine precludes our review of this issue.

*Did the Trial Court Err by Finding That Rogers Was Giving Nonexpert Testimony?*

To review, at his trial, Smith-Parker objected to the State's admission of Rogers' maps; the maps depicted Smith-Parker's general geographical location based on where his calls connected to cell towers in the early morning hours of June 13, 2009, and June 19, 2009. Smith-Parker asserted that Rogers needed to be an expert witness to testify, and because he had had only taken a three-day course from the National White Collar Crime Center on cell phone record mapping, he was unqualified to lay the foundation for the maps he created. The State responded that it was not seeking to qualify Rogers as an expert witness but simply lay foundation for Rogers' maps. Thus, the State argued that Rogers need not be an expert to testify about his maps. Without explanation, the trial court overruled Smith-Parker's objection and admitted Rogers' maps. Consequently, it seems that the trial court adopted the State's position.

Smith-Parker's contention attacks the trial court's adoption of the State's argument. First, Smith-Parker asserts that persons testifying about cell phone record mapping must be qualified expert witnesses. Because the State did not even seek to establish that Rogers was an expert, he alleges that the trial court erred when it allowed Rogers to testify about his mapping. Second, he asserts that this error was prejudicial because the State used it to undermine his defense. The State counters that this court should reject the first part of Smith-Parker's argument because another panel of this court rejected an identical argument in *State v. Fleming*, No. 106,104, 2012 WL 4794560 (Kan. App. 2012) (unpublished opinion). Alternatively, the State argues that the admission of Rogers' testimony was harmless beyond a reasonable doubt.

*Applicable Law*

K.S.A. 2016 Supp. 60-456 provides the rules on both expert and layman witness testimony.  In relevant part, K.S.A. 2016 Supp. 60-456 states:

"(a) If the witness is not testifying as an expert, the testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge finds: (1) Are rationally based on the perception of the witness; (2) are helpful to a clearer understanding of the testimony of the witness; and (3) are not based on scientific, technical or other specialized knowledge within the scope of subsection (b).

"(b) If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if: (1) The testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case."

"Whether a witness, expert or layman, is qualified to testify as to his or her opinion is to be determined by the trial court in the exercise of its discretion." *State v. Sasser*, 305 Kan. 1231, 1243, 391 P.3d 698 (2017). A trial court abuses its discretion when its decision is unreasonable, based on an error of law, or based on an error of fact. 305 Kan. at 1231. A trial court's abuse of discretion in admitting expert testimony is reviewed for harmless error. *State v. Carapezza*, 286 Kan. 992, 1005, 191 P.3d 256 (2008). Appellate courts should "determine if there is a reasonable probability that the error did or will affect the outcome of the trial in light of the entire record." *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011).

*Expert Qualification Unnecessary*

The State relies on this court's decision in *Fleming* that a person need not be an expert to testify about mapping peoples' general geographical location based on where their calls connected to cell towers. In his brief, Smith-Parker acknowledges the *Fleming* decision. All the same, he argues that this panel should reach a different outcome because (1) other jurisdictions have held that persons testifying about cell phone record mapping need to be qualified experts and (2) the *Fleming* court misunderstood cell tower technology.

In *Fleming*, Fleming challenged whether the trial court erred by not considering Detective M.T. Brown's testimony about cell phone record mapping expert testimony. In analyzing Fleming's challenge, the *Fleming* court engaged in an in-depth analysis of other jurisdictions' holdings about whether the person testifying about cell phone record mapping needed to be an expert, concluding that "[c]ourts across the land are not in agreement about the level of expertise necessary to testify about cell phone calls and locations of cell phone towers." 2012 WL 4794560, at *7. Nevertheless, the *Fleming* court ultimately concluded that the trial court in Fleming's case did not abuse its

24

discretion by finding that Detective Brown was providing nonexpert testimony. 2012 WL 4794560, at *8.

Specifically, the *Fleming* court explained:

"We do not find the trial court abused its discretion in allowing Brown to testify and the evidence he provided regarding Fleming's cell phone was not expert testimony. We agree with the trial court's conclusion. Interpreting cell phone data and locating calls within a particular geographic area on a map based on the location of the cell towers used in those calls is not complex, but a relatively simple process. It requires little more than understanding that cell phones generally connect to the nearest tower location and then applying that principle to facts supplied by the cell phone provider." 2012 WL 4794560, at *8.

Importantly, in reaching this conclusion, the *Fleming* court emphasized Kansas' rules on expert witnesses. That is, the *Fleming* court stressed that our Supreme Court only requires expert witness testimony when the subject of the testimony involves something beyond "the normal experience and qualifications of jurors." 2012 WL 4794560, at *8 (citing *State v. Wells*, 289 Kan. 1219, 1236, 221 P.3d 561 [2009]).

Smith-Parker's first complaint is that courts from other jurisdictions have held that persons testifying about cell phone record mapping must qualify as experts. Without adding any additional analysis, he then cites the following cases as support for this proposition: *Wilder v. State*, 191 Md. App. 319, 991 A.2d 172 (2010); *Francis v. State*, 781 N.W.2d 892, 897-98 (Minn. 2010); *State v. Manzella*, 128 S.W.3d 602, 608-09 (Mo. App. 2004); *State v. Robinson*, 272 Neb. 582, 724 N.W.2d 35 (2006); *Wilson v. State*, 195 S.W.3d 193, 200-02 (Tex. App. 2006). Yet, the *Fleming* court explicitly recognized these cases in its opinion. Indeed, the *Fleming* court even considered the *Manzella* and *Wilder* cases at length before reaching its holding. 2012 WL 4794560, at *6. Furthermore, unlike any of the cases Smith-Parker cites to, the *Fleming* court rejected

25

these arguments with Kansas' rules in mind, noting that our Supreme Court does not require expert testimony when "normal experience and qualifications of jurors permit them to draw proper conclusions from the given facts and circumstances, expert opinions are not warranted." 2012 WL 4794560, at *8.

Smith-Parker's second complaint involves attacking the *Fleming* court's understanding of cell tower technology. Smith-Parker complains that the *Fleming* court did not understand that sometimes a cell phone call will connect to a tower with a stronger signal that is actually located further away because the court made the following statement: "It requires little more than understanding that cell phones generally connect to the *nearest* tower location and then applying that principle to facts supplied by the cell phone provider." (Emphasis added.) 2012 WL 4794560, at *8. Oddly, to support that the *Fleming* court misunderstood cell tower technology, Smith-Parker turns to Rogers' trial testimony. At his trial, Rogers testified that when a person makes a call, their call may not connect to the nearest cell tower. Rogers explained that their call may instead go to a more distant cell tower depending on the weather, terrain, surrounding buildings, and surrounding cell phone users.

Clearly, however, Smith-Parker has been critical of the *Fleming* court without basis. Smith-Parker has completely ignored that the word "generally" prefaced the word "nearest"; the *Fleming* court stated that "cell phones *generally* connect to the nearest tower location," not always connect to the nearest tower location. (Emphasis added.) 2012 WL 4794560, at *8. What is more, by attacking the *Fleming* court, Smith-Parker has actually bolstered Rogers' understanding of cell tower technology. He implicitly concedes that Rogers understood cell tower technology, which leads one to ask the following question: What was wrong with Rogers' testimony? Was it somehow based on a flawed understanding of cell tower technology? Based on Smith-Parker's concession that Rogers understood cell tower technology, it is apparent that there were no problems with Rogers' understanding of the technology or testimony. As a result, Smith-Parker's

26

complaints about the *Fleming* court's analysis are not only unfounded, but also indicative of Rogers' ability to competently testify about cell phone record mapping.

Thus, to summarize, Smith-Parker makes two arguments about why this court should not follow the *Fleming* court's decision. Nevertheless, his first argument—the fact that other jurisdictions require cell phone record mapping witnesses to be qualified experts—fails to consider that the *Fleming* court considered and rejected the exact same argument. Moreover, his second argument—his assertion that the *Fleming* court misunderstood cell tower technology—is not only unfounded, but supports that Rogers was qualified to testify about cell phone record mapping.

Ultimately, the *Fleming* court concluded that the witness' "background was sufficient to allow him to assist the trier of fact to understand and interpret the phone records, expert or not." 2012 WL 4794560, at *9. Our case is similar. Smith-Parker has not shown that there was some truly complicated matter involved that required expert testimony. However, even if some portion of Rogers' testimony would properly be characterized as expert testimony, the State laid a sufficient foundation for him to provide that testimony.

Outside of *Fleming*, our research has revealed no other Kansas cases on point. Because the *Fleming* reasoning is sound, we agree with its conclusion, based on the facts of our case, that the cell phone record mapping here was a "relatively simple process" not requiring expert testimony. 2012 WL 4794560, at *8. As a result, we conclude that the trial court properly determined that Rogers was not giving expert testimony.

*Any Error was Harmless*

As a final point, even if we were to assume (1) that Rogers needed to be an expert to testify about cell phone record mapping, and (2) that Smith-Parker met his burden to

27

designate a record that could show prejudicial error, it is still readily apparent that Smith-Parker is not entitled to the reversal of his convictions. This is because he cannot establish that he suffered harm. In his brief, Smith-Parker concedes that any error he suffered was not of a constitutional nature. Thus, the State must establish that there is no reasonable probability that the error affected the outcome of Smith-Parker's trial in light of the record as a whole. See *Ward*, 292 Kan. 541, Syl. ¶ 6.

The State's arguments focus on the fact that Smith-Parker did not object to the admission of his cell phone records through his cell phone carrier's record custodian. Although not clearly stated, it seems that the State argues that because other information about Smith-Parker's cell phone usage on June 13, 2009, and June 19, 2009, was admitted into evidence, any evidence erroneously presented to the jury through Rogers' testimony had a limited effect on the outcome of the trial.

Indeed, this argument has merit. As noted in the facts section of this opinion, the phone records of Smith-Parker, Letourneau, Jenkins, and Graham established that they had been calling each other on their respective cell phones in the early morning hours of June 13, 2009, before the crimes occurred at the Johnstown apartment complex. Phone records also established that Smith-Parker called Jenkins 11 times between 10:18 p.m., June 18, 2009, and 5:42 a.m., June 19, 2009. Kendra even testified that Smith-Parker left a frantic message that was very difficult to understand. Thus, regardless of whether Rogers' testimony undermined Smith-Parker's assertions that he was at Wellman's house the morning of June 13, 2009, when Mack was murdered, and was later with Letourneau in the country, other evidence related to Smith-Parker's cell phone records was incriminating. Regardless of where exactly Smith-Parker was located when he placed the calls, the very fact he placed the calls in conjunction with their timing is highly suspect.

Not to mention, substantial other evidence supported Smith-Parker's guilt. For the second-degree intentional murder of Mack and the theft of Friedman and Johnson's

electronics, the following evidence supported his guilt: (1) the fact that Kendra saw Smith-Parker and her husband Jenkins, Letourneau, and a white man she only knew as Letourneau's stepbrother at her house around 2 a.m. on June 13, 2009; (2) the fact that Smith and Nathan saw Jenkins at the Johnstown apartment complex that morning with a black male; (3) the fact that Yanik-Ducharme was awakened by Smith-Parker and Letourneau later that morning and had a large television that started with a brand name "S"; (4) the fact that Kendra was awakened by Jenkins, Smith-Parker, Letourneau, and a man she knew as Letourneau's stepbrother later that morning, and they were discussing a large screen television; (5) the fact that Kendra was forced to drive Jenkins to the country where he burned Servus brand boots; (6) the fact a person wearing Servus brand boots kicked in Mack's apartment door; (7) the fact that the PlayStation3, videogames, and DVDs stolen from Friedman and Johnson's apartment were later found in Wellman's house; (8) the fact that the gun that discharged and killed Letourneau was used to murder Mack; (9) the fact that Smith-Parker was in possession of the gun used to murder Mack; (10) the fact that Smith-Parker intentionally disposed of the gun used to murder Mack; and (11) the fact that Smith-Parker sent manipulative letters to Wellman and his 7-year-old son in an attempt to create an alibi defense.

For the aggravated assault of Letourneau, witnesses saw Smith-Parker brandishing a gun while threatening Letourneau. Moreover, even if we were to assume that Smith-Parker's testimony was all true, Letourneau's death at the conclusion of his and Smith-Parker's senseless altercation would be by its very definition second-degree reckless murder under circumstances manifesting extreme indifference to the value of human life. In essence, Smith-Parker's and Letourneau's altercation was an alcohol fueled fight in which Smith-Parker decided to bring a gun into the mix. When things had calmed down and Letourneau started "playing with the gun" by pointing it at his head, Smith-Parker's response of "yank[ing]" down with his hand on the gun, which he knew had a "hair trigger," was patently reckless and done with a complete disregard for Letourneau's safety.

In conclusion, even assuming that Smith-Parker had established that the trial court erred by allowing Rogers to testify, Smith-Parker's argument would still fail because there was other evidence pertaining to Smith-Parker's cell phone records that helped establish his guilt. Thus, Rogers' testimony had limited effect on the outcome of the trial. Moreover, the weight of the evidence against Smith-Parker was of such an overwhelming nature that Rogers' testimony could have had no effect on the jury's verdicts. As a result, Smith-Parker's argument fails.

## *Did the Trial Court Err When Instructing the Jury?*

Smith-Parker's next argument concerns the limiting instruction that the trial court provided the jury. Smith-Parker takes issue with certain language within the limiting instruction. Specifically, he challenges the language that evidence was admitted "tending to prove that [he] committed crimes other than the present crimes charged" because he asserts that this language was factually inappropriate. After arguing error, he then asserts that the error resulted in the jury's guilty verdict for his second-degree murder of Mack conviction.

The State responds by simply asserting that Smith-Parker invited any error that resulted from the giving of the instruction.

### *Applicable Law*

When reviewing alleged jury instruction errors, this court engages in a four-part analysis, each with its own standard of review:

> "'(1) First, the appellate court should consider the reviewability of the issue from both
> jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2)

30

next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).' [Citation omitted.]" *State v. Fisher*, 304 Kan. 242, 256-57, 373 P.3d 781 (2016).

Under the first step of this analysis, this court must determine if the defendant objected to the complained about instruction. If the defendant did not object to the complained about instruction, the defendant must establish that the instruction was clearly erroneous to attain reversal. *State v. Cooper*, 303 Kan. 764, 770, 366 P.3d 232 (2016). To establish clear error, the defendant must "'firmly convince'" the appellate court that the instruction error affected the verdict. 303 Kan. at 770. Furthermore, a defendant's jury instruction challenge is not properly before this court if the defendant invited the instruction error he or she complains about. *State v. Logsdon*, 304 Kan. 3, 31, 371 P.3d 836 (2016).

*Additional Background Information*

To review, before his second jury trial, Smith-Parker filed a motion in limine requesting that the State not be allowed to use any evidence tending to support that he had burglarized either Mack's or Friedman and Johnson's apartments given that he had been acquitted of those charges at his first trial. The State responded that although it would never use the term "burglary," it would be admitting evidence tending to prove that Smith-Parker committed aggravated burglaries while presenting its case against Smith-Parker for murder and theft. Thus, the State requested that the trial court rule whether it could admit such evidence as K.S.A. 60-455 evidence. After a hearing, the trial court denied Smith-Parker's motion while granting the State's K.S.A. 60-455 motion.

31

Because it was allowing the State to admit K.S.A. 60-455 evidence, the trial court ruled that there would be a limiting instruction concerning this evidence given to the jury.

Shortly before the end of the State's case, both the State and Smith-Parker submitted their proposed jury instructions to the trial court. Smith-Parker's proposed limiting instruction stated:

"Evidence has been admitted *tending to prove* that the defendant engaged in conduct or committed an alleged crime, although he was acquitted of that alleged crime in a previous trial, other than the present crime charged. This evidence may be considered solely for the purpose . . . of proving the defendant's plan and opportunity." (Emphasis added.)

At the jury instruction conference, the trial court suggested an instruction that differed in some respects from Smith-Parker's proposed instruction. The trial court's proposed instruction, which it ultimately gave to the jury, stated:

"Evidence of damage to property and attempts to enter other apartments has been admitted *tending to prove* that the defendant committed crimes other than the present crimes charged. This evidence may be considered solely for the purpose of proving the defendant's identity, opportunity, and plan." (Emphasis added.)

The State had no objections to the trial court's instruction. Smith-Parker, however, renewed his objection to the admission of any evidence tending to prove that he had committed any burglaries given his acquittals.

Further, it also appears he objected to the fact no language regarding his acquittals was included in the limiting instructions. The exchange between Smith-Parker's attorney and the trial court about the instruction, in its entirety, was as follows:

32

"[DEFENSE COUNSEL:] Your Honor, for the record, I think I still need to object to this. Overall, that any evidence of the burglaries that he was acquitted of came into evidence, so I would still renew my objections to that, that entire line of evidence and testimony.

"THE COURT: Okay. And the Court notes your objection. And the Court did previously make a ruling[,] any objection as to this instruction.

"[DEFENSE COUNSEL:] Your Honor, I would—

"THE COURT: The evidence has already been in at this point. At this point we're talking about the instruction.

"[DEFENSE COUNSEL:] So at this time I would still ask for language—it still feels like, when we talk about proving the defendant committed crimes, I mean, he's been acquitted of those crimes, so I would still object to the instruction. I know that we had a little discussion off the record, that this is what the Court—I mean, the Court has made that ruling and—

"THE COURT: So your objection to the Court [is] even giving that instruction?

"[DEFENSE COUNSEL:] No, I know we have to have some type of limiting instruction, I do believe that. I guess I would still like some language in the instruction, and I knew we talked a little about it this morning off the record. These crimes that—he was still acquitted of them, Your Honor, so I still just object to that entire, all of the evidence coming in, Your Honor, regarding the prior—calling it a prior bad act.

"THE COURT: Okay. The Court notes the objection."

*Smith-Parker Invited Any Error*

In his brief, Smith-Parker cites the preceding exchange between his trial attorney and the trial court as evidence that he has preserved his argument for appeal. Meanwhile, the State cites the preceding exchange as well as Smith-Parker's trial attorney's proposed jury instruction as evidence that Smith-Parker invited any error that he now complains about on appeal.

On appeal, Smith-Parker complains that the trial court should not have given a limiting instruction that told the jury that evidence had been admitted "tending to prove

that [he] committed crimes other than the present crimes charged." Yet, his very own proposed limiting instruction had substantively identical language. If one omits the language concerning burglary acquittals, Smith-Parker's proposed limiting instruction stated that evidence had been admitted "tending to prove that [he] engaged in conduct or committed an alleged crime . . . other than the present crime charged." Additionally, during the exchange with the trial court, Smith-Parker's trial attorney explicitly stated that "some type of limiting instruction" had to be given since the K.S.A. 60-455 evidence had been admitted; her problem was that the K.S.A. 60-455 evidence had been admitted in the first place.

Yet, this is not what Smith-Parker's appellate attorney has challenged on appeal. Instead, his appellate attorney argues that the trial court erred by using the "tending to prove" limiting instruction because it was factually inappropriate. His appellate attorney argues the limiting instruction was factually inappropriate because the State had failed to present evidence to prove that Smith-Parker had committed crimes other than the crimes presently charged. Moreover, Smith-Parker's appellate attorney does not argue that it was factually inappropriate because Smith-Parker was acquitted of the burglaries like his trial attorney did below. Consequently, not only is Smith-Parker raising a completely new argument for the first time on appeal, his current argument is different from the argument he raised to the trial court.

Under the doctrine of invited error, a defendant cannot invite error and then complain about it on appeal. *State v. Verser*, 299 Kan. 776, 784, 326 P.3d 1046 (2014). Appellate courts have held that the invited error doctrine applies to defendants challenging the wording of instruction errors that they agreed to on the record before the trial court. See, e.g., *State v. Peppers*, 294 Kan. 377, 393, 276 P.3d 148 (2012). Because Smith-Parker's trial attorney submitted a proposed jury instruction with essentially the same language as the one given by the trial court, there is no reason why the invited error doctrine should not apply in this instance. Moreover, this court has said many times that a

34

party should not be able to argue one position at trial and, then on appeal, argue a different one. As a result, we reject Smith-Parker's argument.

*Was There Cumulative Error?*

Smith-Parker argues that if the preceding errors do not require reversal individually, then this court should consider whether those errors require reversal when considered cumulatively.

Under the doctrine of cumulative error, appellate courts must consider whether a defendant's right to a fair trial was substantially prejudiced by cumulative errors when considered under the totality of the circumstances and in the context of the entire record. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). Appellate courts cannot find cumulative error, however, if a defendant fails to establish any error. *State v. Marshall,* 303 Kan. 438, 451, 362 P.3d 587 (2015). Here, because Smith-Parker failed to establish any error there cannot be cumulative error. Therefore, Smith-Parker's cumulative error argument fails.

*Did the Trial Court Err in Sentencing Smith-Parker?*

Appellate courts exercise unlimited review when construing the KSGA and determining the constitutionality of its provisions. See *State v. Davis*, 275 Kan. 107, 124, 61 P.3d 701 (2003).

Smith-Parker's last argument is that the trial court erred when it sentenced him. He asserts that the trial court erred when it sentenced him in two ways. First, Smith-Parker argues that the trial court erred when it used his criminal history to enhance his presumptive prison sentence without first submitting his criminal history to a jury for proof beyond a reasonable doubt. Smith-Parker contends that the trial court's failure to

35

submit his criminal history to a jury for proof beyond a reasonable doubt violated his Sixth and Fourteenth Amendment rights as explained by the United States Supreme Court in *Apprendi*. Second, Smith-Parker complains that the trial court further violated his constitutional rights as explained by the United States Supreme Court in *Apprendi* when it sentenced him to the aggravated-box presumptive KSGA sentences without "putting the aggravating factors before the jury and requiring the State [to] prove them beyond a reasonable doubt." Smith-Parker asserts that the United States Supreme Court case *Cunningham v. California*, 549 U.S. 270, 291, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007), which held that California's sentencing scheme could not "withstand measurement against our Sixth Amendment precedent" because it "authorize[d] the judge, not the jury, to find the facts permitting an upper term sentence," supports this claim of error.

Yet, as argued by the State in its brief, our Supreme Court has already decided both of Smith-Parker's arguments against him. Regarding the use of Smith-Parker's criminal history to enhance his presumptive prison sentence, our Supreme Court rejected an identical argument in *State v. Ivory*, 273 Kan. 44, 46, 41 P.3d 781 (2002). In *Ivory*, our Supreme Court explained that "[t]he KSGA builds criminal history into the calculation of a presumptive sentence, rather than using criminal history as an enhancement" and the *Apprendi* court explicitly carved out an exception for courts to use a defendant's prior conviction to increase that defendant's penalty. 273 Kan. at 46. Regarding the trial court's decision to sentence Smith-Parker to the aggravated-box presumptive KSGA sentences, our Supreme Court in *State v. Johnson*, 286 Kan. 824, Syl. ¶ 5, 190 P.3d 207 (2008), held: "A sentence to any term within the range stated in a Kansas sentencing guidelines presumptive grid block does not violate *Cunningham v. California*, 549 U.S. 270, 127 S.Ct. 856, 166 L. Ed. 2d 856 (2007), or *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L. Ed. 2d 435 (2000)." Our Supreme Court reached this holding because under the KSGA, "a judge has discretion to sentence a criminal defendant to any term within the presumptive grid block" and "need not conduct any fact finding or state factors on the record" to do so. *Johnson*, 286 Kan. at 851.

36

This court is duty bound to follow our Supreme Court precedent absent some indication that our Supreme Court is moving away from its earlier holding. *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015). Here, there is no indication that our Supreme Court is moving away from its holding in either *Ivory* or *Johnson*. As a result, we are bound to follow *Ivory* and *Johnson* precedent.

Affirmed.